BROWN, J., dissenting; WALKER, J., concurring in the dissenting opinion.
This is an action to recover damages for personal injury caused as alleged, by the negligence of the defendant. The action is brought by Andrew Krachanake, Jr., a minor ten years of age, by his father, Andrew Krachanake, Sr., as his next friend. *Page 464 
The father is a native of Austria-Hungary. He left that country with his family fifteen years ago and has lived since then two years in Ohio, eight years in Canada, and five years in this State.
This country declared war against Austria-Hungary after the verdict was returned in the action, but before the judgment was signed.
The defendant contends that the action cannot be maintained because the plaintiffs are alien enemies. This objection was overruled and the defendant excepted.
The negligence alleged is in permitting dynamite caps or cartridges to be kept in unlocked boxes in an open house near a highway and easy of access to children and other people.
There was evidence tending to prove that the plaintiff, Andrew Krachanake, Jr., entered the house and took the caps therefrom and carried them to his home, and while standing before the fire with one of the caps in his hand, the cap exploded and caused the loss of two of his fingers and serious injury to one of his eyes.
The other facts necessary to an understanding of the case will appear in the opinion.
There was a motion for judgment of nonsuit, which was overruled, and the defendant excepted.
The jury returned a verdict in favor of the plaintiff, and from the judgment rendered thereon the defendant appealed.
The first question presented by the appeal is as to the right of the plaintiff, a native of Austria-Hungary and resident in this State, to maintain an action in our courts as next friend to recover damages for personal injury to his infant son.
The plaintiff left Austria-Hungary fifteen years ago, and since then has lived two years in Ohio, eight years in Canada, and five years in this State.
There is neither allegation nor evidence that he has been guilty of any act or utterance unfriendly to the United States, and so far as the record discloses he is a quiet law-abiding laborer. He comes, however, within the classification of an alien enemy, because the country to which he owes allegiance is at war with the United States, and conceding that his son, who was seven years old at the time of his injury, stands in the same relation to this government as his father, which does not seem to be the American rule (12 Mod. Am. L., 143; case of Carl Gundlich, 12 Mod. Am. L., 698), can the action be maintained? *Page 465 
The question is new in this Court, but it has been considered so frequently and with such unanimity of opinion in England and America, and the conclusion reached has been so clearly recognized by the President in his proclamation after the declaration of war against Germany and Austria-Hungary, and by Congress in the "Trading with the Enemy Act," that but little is left for us to do except to give the result of our investigations.
The statement is often made by the law writers that an alien enemy cannot sue, and upon the ground that to permit a recovery would strengthen and add to the resources of the hostile government, and correspondingly weaken our government, but when reference is had to the facts, it is found that the principle predicated upon residence in the country at war with ours, and that it has no application to the alien enemy resident here, who may be interned and held as a prisoner of war without the right to apply for the writ of habeas corpus, and whose property may be taken into custody by the Government. See not to Daimler Co. v. Continental Tire Co., Anno. Cases, 1917 C, 193, where the authorities are collected.
The test, therefore, of the right to sue, which has been universally adopted, is residence and not nationality, where the alien enemy is and not what he is.
This was substantially declared in 1697 in Wells v. Williams, 1 Lord Raym, 282, and was approved in 1813 in an opinion by Chancellor Kent inClarke v. Morey, 10 Johns., 70, and in 1915 in an opinion by Lord Reading, Chief Justice of England, in Porter v. Freudenberg (1 K. B., 857), Anno. Cases, 1917 C, 215.
The learning upon the question will be found in these two (438) opinions, and in an interesting article in the Yale Law Journal
of December, 1917, written by Mr. Picciotto of the Inner Temple, London, and in the notes to Daimler Co. v. Continental Tire Co., Anno. Cases, 1917 C, 193.
In Clarke v. Morey, the plaintiff, a resident of New York, was a subject of Great Britain; war then existed between that country and the United States, and it was objected that the plaintiff could not prosecute his action in the courts of the State of New York, which is the case presented by this record.
Chancellor Kent said in answer to the objection: "The disability (to sue) is confined to these two cases: (1) Where the right sued for was acquired in actual hostility, as was the case of the ransom bill in Anthonv. Fisher, Doug., 649, note; (2) Where the plaintiff, being an alien enemy, was resident in the enemy's country, such was the form of the plea inGeorge v. Powell (Fortesc., 221), and in Lee Bret v. Papillon *Page 466 
(4 East, 502); and such was the case with the persons in whose behalf and for whose benefit the suit was brought upon the policy, in Brandon v.Nesbitt (6 Term Rep., 23).
"It was considered in the Common Pleas at Westminister as a settled point (Health, J., and Rooke, J., in Sparenburgh v. Bannatyne, 1 Bos. Pull., 163) than an alien enemy under King's protection, even if he were a prisoner of war, might sue and be sued. This point had long before received a very solemn decision in the case of Wells v. Williams (1 Lord Raym., 282; 1 Lutw., 34; S.C., 1 Salk., 46). It was there decided that if the plaintiff came to England before the war, and continued to reside there by the license and under the protection of the King, he might maintain an action upon his personal contract; and that if even he came to England after the breaking out of the war and continued there under the same protection, he might sue upon his bond or contract; and that the distinction was between such an alien enemy and one commorant in his own country. The plea, in that case, averred that the plaintiff was not only born in France, under the allegiance of the French King, then being an enemy, but that he came to England without any safe conduct, and the plea was held bad on demurrer. It was considered that if the plaintiff came to England in time of peace and remained there quietly, it amounted to a license, and that if he came in time of war and continued without disturbance, a license would be intended. . . . In the case before us, we are to take it for granted (for the suit was commenced before the present war) that the plaintiff came to reside here before the war, and no letters of safe conduct were, therefore requisite, nor any license from the President. The license is implied by law and the usage of nations; if he came here since the war, a license is also implied, and the protection continues until the executive shall think proper to order the plaintiff out (439) of the United States; but no such order is stated or averred. . . . Until such order, the law grants permission to the alien to remain, though his sovereign be at war with us. A lawful residence implies protection, and a capacity to sue and be sued. A contrary doctrine would be repugnant to sound policy, no less than to justice and humanity.
"The right to sue in such a case rests on still broader ground than that of a mere municipal provision, for it has been frequently held that the law of nations is part of the common law. By the law of nations, an alien who comes to reside in a foreign country, is entitled, so long as he conducts himself peaceably, to continue to reside there, under the public protection; and it requires the express will of the sovereign power to order him away. . . . We all recollect the enlightened and *Page 467 
humane provision of Magna Charta (c. 30) on this subject, and in France the ordinance of Charles V., as early as 1370, was dictated with the same magnanimity; for it declared that in case of war, foreign merchants had nothing to fear, for they might depart freely with their effects, and if they happened to die in France their goods should descend to their heirs. (Henault's Abrege Chron., tom. 1, 338). So all the judges of England resolved, as early as the time of Henry VIII., that if an alien came to England before the declaration of war, neither his person nor his effects should be seized in consequence of it. (Bro., tit. Property, pl. 38, Jenk. Cent., 201, case 22.) And it has now become the sense and practice of nations, and may be regarded as the public law of Europe (the anomalous and awful case of the present violent power on the Continent excepted that the subjects of the enemy (without confining the rule to merchants), so long as they are permitted to remain in the country, are to be protected in their persons and property, and to be allowed to sue as well as to be sued."
Lord Reading, discussing the same question, says: "It is clear law that the test for this purpose is not nationality but the place of carrying on the business," and Mr. Picciotto: "In the Anglo-American system of law the test is now well settled; it is a test not of nationality but of residence or commercial domicile, not what a man is but where his business is."
Mr. Picciotto also refers to Schaffenius v. Goldberg, 1 K. B., 284, decided in 1916, and affirmed on appeal, in which it was held that an interned alien enemy could sue in the courts of England, Younger, J., saying: "There has been a gradual and progressive modification in the rules of the old law in their restraint and discouragement of aliens. It is, as I have already indicated, not the nationality, but the residence and business domicile of the plaintiff that are now all important."
After the declaration of war against Austria-Hungary, the President issued his Proclamation No. 1417, similar to one (440) issued after war was declared against Germany, which after quoting the resolution declaring war and stating that he was acting under and by virtue of authority vested in him by the Constitution of the United States and sections 4067 et seq., United States Revised Statutes, he declared as follows:
"I do hereby further proclaim and direct that the conduct to be observed on the part of the United States towards all natives, citizens, denizens, or subjects of Austria, being males of the age of fourteen years and upwards, who shall be within the United States and not actually naturalized, shall be as follows: *Page 468 
"All natives, citizens, denizens, or subjects of Austria-Hungary being males of fourteen years and upwards who shall be within the United States and not actually naturalized are enjoined to preserve the peace towards the United States and to refrain from crime against the public safety, and from violating the laws of the United States and of the States and Territories thereof, and to refrain from actual hostility or giving information, aid or comfort to the enemies of the United States, and to comply strictly with the regulations which are hereby, or which may be from time to time promulgated by the President, and so long as they shall conduct themselvesin accordance with law, they shall be undisturbed in the peaceful pursuitof their lives and occupations and be accorded the consideration due to allpeaceful and law-abiding persons, except so far as restrictions may benecessary for their own protection and for the safety of the United States;and towards such persons as conduct themselves in accordance with law, allcitizens of the United States are enjoined to preserve the peace and totreat them with all such friendliness as may be compatible with loyalty andallegiance to the United States." (Italics ours.)
One of the important acts of Congress growing out of the present war is what is known as "Trading with the Enemy Act," and it is therein provided that "The word `enemy' as used herein shall be deemed to mean for the purpose of such trading and of this act: (a) Any individual, partnership, or other body of individuals of any nationality, resident within the territory (including that occupied by the military and naval forces) of any nation with which the United States is at war, or resident outside the United States and doing business within such territory," etc., thereby clearly recognizing residence or doing business in hostile territory as the test of an alien enemy for the purpose of trading.
It appears, therefore, that under the common law, and in accordance with the spirit and declared purpose of the President in his proclamation, and by Congressional interpretation, the father, against whom nothing is urged except that he was born in Hungary, if the real plaintiff, would be entitled to maintain the action.
(441) The father is not, however, a party in the legal sense. He is an officer appointed by the court to protect the interest of his son, who is the real plaintiff (Hockaday v. Lawrence, 156 N.C. 322), and the son is ten years of age and was born in Canada, a province of Great Britain, with which we are in alliance, and while most of the European countries have adopted the rule that nationality follows parentage. "The United States and Great Britain follow the older territorial rule according to which nationality is primarily determined by the place of birth." 12 Mod. Am. L., 143. *Page 469 
In United States v. Wong Kim Ark, 169 U.S. 649, it was held that a Chinaman born in the United States of parents who were the subjects of the Emperor of China was an American citizen, and the Court says of the English rule, "The fundamental principle of the common law with regard to English nationality was birth with the allegiance."
In 1907 Carl Gundlich applied to Mr. Tower, Ambassador to Germany, for a passport for his minor son, upon the ground that he was an American citizen.
It appeared that the father and his wife came to the United States in 1886, and remained here one year and a half during which time the son was born, that the family returned to Germany in 1887, no one of them being naturalized, and had lived there since then, with no intention of returning to this country, and owning no property here.
The matter was referred to the acting Secretary of State, Mr. Bacon, who ruled that the son was a citizen of the United States, with the right to elect his nationality upon becoming twenty-one years of age. 12 Mod. Am. L., 698.
Again the proclamations of the President and the rules and regulations of the Attorney General under the act of Congress requiring alien enemies to register do not seem to include those under fourteen years of age, nor do the reasons which prevent alien enemies under certain conditions from resorting to our courts prevail in the case of the son, as the money received will be in charge of a guardian appointed by our courts, and cannot be removed from the State without the consent of the court, so that the danger of its being used to strengthen the hands of the enemy is entirely removed.
We have no doubt that the action can be maintained.
The second question relied on by the defendant is whether there was sufficient evidence of negligence to be submitted to the jury.
The evidence construing it most favorably for the plaintiff, which is the rule on motions for judgment of nonsuit, tends to prove the following facts:
1. That the defendant was engaged in the manufacture and sale of fertilizer in the town of Acme, North Carolina, and in its business it mined marl within the corporate limits for use in its (442) fertilizers; that the mine was located about one-fourth of a mile from the railroad station; that within a radius of two blocks of the mine of the town of Acme there lived 100 to 150 people, the nearest residence being about 75 yards from the mine; that one of the main roads in Acme ran within 75 or 100 yards of a small house where dynamite caps were stored by defendant, and at this point a road or path ran from this road to the house; that the house and machinery at the mine were visible from the thoroughfare. *Page 470 
2. At this mine blasting was carried on and dynamite and dynamite caps were used for blasting purposes.
3. That neither mine, house, nor blasting place was enclosed or fenced in.
4. That prior to the time of plaintiff's injury, children were seen playing around the mine and near the house.
5. That the path from the road led to the small house where the dynamite caps were kept.
6. That the door to the house had a hole cut in it, and a hook on the inside with which to fasten the door, and in order to open the same a person would run his hand into a pigeon hole, unfasten the hook and open the door.
7. That the door was not kept locked or nailed up.
8. That the plaintiff, then a boy seven years of age, having gone to school that day and there being none, started to Acme and arrived at the place where the path led to the house where the dynamite was kept; he walked down the path and looked in the door, which was open, and saw two boxes of dynamite caps — one of them being closed and the other open. He went into the house, took five of the caps and carried them home with him. Upon arriving home he went to the fire and was holding his hand to the fire, in which hand he held one of these caps, which exploded, blowing off two of his fingers and injuring his right eye.
9. That the plaintiff did not know the dangerous character of the cap, not having seen one before.
This brings the plaintiff's case within the principle of Barnett v.Cotton Mills, 167 N.C. 580, in which the authorities dealing with injuries to children by explosives are collected and from which we quote briefly as follows:
"In Powers v. Harlow, 53 Mich. 507, Judge Cooley says: `Children, wherever they go, must be expected to act upon children's instincts and impulses, and others who are chargeable with a duty of care and caution towards them, must calculate accordingly. If they leave exposed to the observation of children anything which would be tempting to them, and which they in their inmature judgment might naturally (443) suppose they were at liberty to handle or play with, they should expect that liberty to be taken.' In this case it was held that the defendant was guilty of negligence, when it appeared that defendant kept on his premises over which the injured person, a boy, was in the habit of passing, in an exposed place, certain dangerous explosives, which a boy discovered and exploded with serious injury to his person. *Page 471 
"In Mattson v. Minnesota Ry. Co., 95 Minn. 477, Justice Brown says: `There is nothing so attractive to young boys as articles of an explosive nature, and the greater the volume of sound that may be produced, the greater the attraction. As compared with ordinary turntable, dynamite is vastly more attractive. Young children are incapable of comprehending the dangers in handling or exploding the same, and their natural instincts urge them into experiments with it whenever it comes within their reach. The degree of care required of persons having the possession and control of dangerous explosives, such as firearms or dynamite, is of the highest. The utmost care must be exercised respecting the care and custody of such instrumentalities to guard against injury to others. The degree of care must be commensurate with the dangerous nature of the article, and greater and more exacting as respects young children.' . . . In Olson v. HomeInvestment Co., 27 L.R.A. (N.S.), 884, it was held that the act of boys in stealing or attempting to explode dynamite negligently left unguarded in an unlocked shanty on a vacant city lot is not such an intervening cause of injury to one of them by an explosion as will, as a matter of law, relieve this owner from liability for the injury, if the boys might have been found from their age and knowledge of right and wrong to have been governed by unreasoning and natural impulses. . . . In Brittingham v. Stadiem,151 N.C. 302, Justice Manning quotes with approval from Mattson v. R. R.,supra: `The degree of care required of persons having the possession and control of dangerous explosives, such as firearms and dynamite, is of the highest. The utmost caution must be used in their care and custody, to the end that harm may not come to others from coming in contact with them. The degree of care must be commensurate with the dangerous character of the article'; and the same case is cited by Justice Brown in Wood v. McCabe,151 N.C. 458, in support of the proposition that `All courts and writers agree that the degree of care required of persons using such instrumentalities as dynamite in their business is of the highest and what might be reasonable care in respect to grown persons of experience would be negligence as applied to youth and children. 7 A. E., 411; Mattson v. R.R., 111 Am. Sr., 487.'"
We have examined the other exceptions and find nothing justifying a new trial.
No error.