## LONE STAR GAS CO. v. PARSONS et al.

No. 20587. Opinion Filed June 28, 1932.

Rehearing Denied Sept. 14, 1932.

Owen & Looney, J. Fred Swanson, and Paul N. Lindsey, for plaintiff in error.

S. H. Singleton and Sandlin & Winans, for defendant in error.

SWINDALL, J. The plaintiff, who was seven years old at the time of the trial, which was held about two years and a half after the damage alleged, sued to recover for personal injuries sustained from an explosion which he caused by driving a nail into a dynamite cap. The circumstances leading up to the explosion were as follows:

Sometime before the finding of the caps the defendant had a Mr. McGahey drill a gas well for it upon the location where the caps were found, but the contract required the defendant to dig the cellar. The day before Mr. McGahey came to the premises the cellar had not been dug, and he suggested to one of the defendant's employees that they use dynamite caps in digging it. The next day he saw a small box of dynamite caps on the ground around where the defendant's employees were engaged in digging the cellar. A highway officer who hauled some of the machinery to the location was asked for dynamite caps by some of the defendant's employees, and he gave them about a box of caps which belonged to the county. It appears, however, that none of the caps were used in the work. Mr. McGahey testified that he did not see any dynamite caps later until the day he was cleaning up, getting ready to leave the premises after drilling the well, when he saw a box on the bank of the slush pit and threw them into the pit to dispose of them. The location was the location of the Daisy Reed No. 2 well. Mr. McGahey's testimony was all directed to the location upon which he drilled, but he erred in calling it the Daisy Reed No. 1 location. The defendant's field superintendent testified that other parties had drilled the Daisy Reed No. 1 well back in 1921, several years before the drilling of the Daisy Reed No. 2, that the well drilled by Mr. McGahey was the Daisy Reed No. 2, and several other witnesses testified that it was Mr. McGahey who drilled the Daisy Reed No. 2 well.

The premises upon which the well was located were agricultural premises, and at the time the caps were found the field in which the well location was situated was under lease to a Mr. Bradshaw, who cultivated the field right up to the edge of the slush pit. The caps were found by his son on the bank of the slush pit one day when Mr. Bradshaw was working in his crop. The boy had brought water to him, and after he found the caps he ran to show his father what he had and the father told the boy that he "thought he had something that he ought not to have," but he also said that he got the impression that what the boy had was something that had been discharged and was not dangerous and that he dismissed the matter from his mind. The caps had much the appearance of a discharged 22-caliber shell, having a metal barrel slightly larger in circumference, but open at the end as the shells are after the bullet has been discharged, and the boys used them as whistles. Mr. Bradshaw testified that he knew what dynamite caps were, and that if he had examined the caps he would have known what they were and that they were dangerous. The boy had them about the house on the floor for several days and then he gave several of them to the plaintiff, who after he had them for a few days hurt himself in the manner above stated. The Bradshaw boy was nine years of age at the time of the trial, about two years and a half after the explosion. The plaintiff's father knew that his boy had the caps, but did not know what they were or that they were dangerous. There was a path near the slush pit and some children would sometimes pass through the field in going to and from school, and the Parsons children used to pass through the field going to their grandmother's and would pass near the slush pit if they used the path, the well location being directly in line. The Bradshaw children helped their father in cultivating the cotton crop in the field where the well location was situated.

One of the plaintiff's fingers was blown partly off and had to be amputated, and his thumb was split and his legs were burned to some extent. There appears to have been no permanent damage except the loss of the finger.

The defendant did not keep caps in its storehouse for use in the work done by its employees in the field, and apparently no one connected with the company other than the employees who procured them had any knowledge of them being on the premises.

The jury returned a verdict for the plaintiff in the sum of $2,500.

The defendant urges a number of assignments of alleged error, among them being that the court erred in admitting incompetent, irrelevant, and immaterial evidence. On that point it urges that the error was in admitting Mr. McGahey's deposition because he testified to occurrences at the Daisy Reed No. 1 well location. His error was explained before the deposition was offered. The assignment is without merit.

54 ·

■ The defendant also asserts that there was error in overruling its demurrer to the evidence interposed when the plaintiff rested. The defendant did not stand upon the demurrer, but proceeded to introduce evidence in its defense, so the assignment is untenable. Local Bldg. & Loan Assn. v. Hudson-Houston Lumber Co., 150 Okla. 44, 3 P. (2d) 156.

■ The defendant also alleges that there was error in overruling its demurrer to the evidence interposed after both parties had finally rested and that there was error in the instructions given and in refusing certain requested instructions. We shall first consider the alleged error in overruling its demurrer.

The demurrer was urged upon three grounds: (1) That the evidence was insufficient to prove a cause of action; (2) that the evidence was insufficient to prove the allegations of the plaintiff's petition; and (3) that there was a fatal variance between the plaintiff's proof and the allegations of his petition.

The second and third grounds may be considered together, for it was immaterial that the plaintiff did not prove the allegations of the petition if by the variance he proved sufficient in lieu of allegations not proven to prove a cause of action, unless this variance was fatal. The variance had to do merely with the line of causation. In the petition it was alleged that the caps would naturally be seen where they were and that they were found by the plaintiff and by the Bradshaw boy, whereas the evidence showed that they were found by the Bradshaw boy and that some of them were given to the plaintiff several days later.

If the evidence was sufficient to prove a cause of action, the variance was immaterial, because the defendant did not claim surprise or request an adjournment on that ground. C. O. S. 1921, section 312; Chase v. Andrews, 145 Okla. 300, 291 P. 114; McGrath v. Durham, 151 Okla. 55, 1 P. (2d) 718; Forbes v. Becker, 150 Okla. 281, 1 P. (2d) 721.

■ The remaining ground of demurrer was that the evidence was insufficient to prove a cause of action. The greater part of the brief consists of a contention that the negligence was not the proximate cause of the harm, but following that part the defendant cited one case, Simmons v. C. & O. Ry. Co. (W. Va.) 124 S. E. 503, which held that no duty was owed to a young infant who was hurt by the explosion of a dynamite cartridge which he found upon the right of way, notwithstanding the fact that he did not know what it was or that it was dangerous, the denial being upon the ground that there was no duty to protect trespassers and that the trespasser was "an infant of tender years" did not alter the rule. The defendant also cited some other cases involving different instrumentalities, one holding that it was necessary that the instrumentality attract the infant from outside of the premises and that it was not sufficient that he be attracted by it after his entry, apparently there being no reasonable probability of the presence of children at the particular place where the harm occurred, and another case in which it seems that the real ground of decision was that although there was ground to anticipate the presence of children, there was no sufficient ground to anticipate that the instrumentality would attract them. The defendant also quoted an extract from the opinion in the case of Pollard v. Oklahoma City Ry. Co., 36 Okla. 96, 128 P. 300, in which the court expressed an opinion that the attractive nuisance doctrine would not apply under the facts of that case, and that it would not apply if the child who found the powder had been an infant "of tender years." That case turned upon the problem of proximate cause, and the remarks of the court do not indicate just why it thought that the doctrine would not apply, unless it considered that since the boy who found the powder and the one who was hurt were respectively 14 and 13 years of age, they were at such ages that they had the experience and intelligence to be properly classed with adults, or that in any event the warnings of danger and the threats of the parents of the boy who found the powder would result in a sufficient appreciation of the danger to make the use of it mere bravado with a full consciousness of the danger involved. As a matter of fact the decision was expressly based upon the lack of proximate cause, and since the remarks of the court as to the applicability of the doctrine of attractive nuisance under the peculiar facts of the case contain some expressions which are not clear and were mere dicta with the reasons not clearly set forth, those remarks are not authority, nor are they even persuasive upon the applicability of the doctrine.

Some courts wholly repudiate the doctrine of attractive nuisance, so that if an infant is hurt upon the premises he cannot urge the doctrine, but even in those jurisdictions if the instrumentality is something which there is a likelihood of the infant removing from the premises and resulting in harm to an in-

nocent outsider, in all probability the court would recognize a duty to avoid harm to the outsider. However, in this jurisdiction the doctrine of attractive nuisance is recognized, and the same principles are involved in the case where the instrumentality is removable and an outsider may be harmed and where it is the infant who is harmed either off of the premises by a removable instrumentality which he has taken away, or upon the premises by a local instrumentality. The difference between the local instrumentality and the removable instrumentality merely being that the one presents no possibility of harm to the outsider, but the other does, but only through the infant as an agency. In jurisdictions recognizing the doctrine the problems involved in determining whether a duty exists and whether a duty has been breached are discussed under the doctrine of attractive nuisance whether it be the infant or the outsider who was harmed.

Unfortunately the courts that do not repudiate the doctrine often attempt to save themselves from admitting what is clearly the fact, that the doctrine is an exception to the usual rule denying a duty to exercise care under the circumstances to avoid the harm to trespassers, and to avoid it by saying that since the instrumentality is not only attractive, but "alluring," the infant is an invitee. A man may so act as to imply an invitation, as by fitting up his premises for a playground, but when a man is doing no more than use the premises for his own convenience or for some economic purpose, it is a perversion of language to say that merely because he has created a condition that is attractive to children, even though children have been in the habit of coming upon his premises without effort upon his part to prevent it, that by attraction, allurement, or failure to object to their presence, he invites the children. The plain fact is that they do not come at his desire, that their coming is not willed by him, and that usually their presence is objectionable, even though the objection be not expressed, and that they are trespassers and nothing else, tolerated though they may be. Nor is the condition strictly a nuisance, as it is not calculated to cause harm and harm does not result merely from what the owner does, but only in consequence of the conduct of another. The only resemblance it has to a nuisance is that the harm is consequential, as is usually the case with nuisance, and there is therefore a continuation of what, since it is negligent, is objectionable. The problems involved would be more simple if we would recognize that we were dealing merely with

a problem of whether a duty to exercise care should be imposed, of whether, conceding there was some duty, sufficient care was used, and that the doctrine involves an exception to the rule denying protection to trespassers.

The doctrine presents a necessity of compromise between the impolicy of imposing duties restricting a landowner in the use which he makes of his premises and what he does upon them, and a probability of harm that urges the imposition. It is with reluctance that courts impose such duties upon landowners. They will not impose a duty to alter the natural condition of premises, nor a duty to exercise care in the safe-keeping of instrumentalities that are common and are in common everyday use. The doctrine is limited to instrumentalities that are unusual and with which children do not commonly come into contact. which are especially dangerous in their nature, and which are of a character to prompt the curiosity and interest of an infant and thereby lead to his tampering with them. Nor will the doctrine be applied to protect an infant who is of sufficient age and experience to be conscious of an appreciable element of danger inhering in the tampering with the instrumentality to an extent that it would be expected that he would not jeopardize his safety by tampering, or where he has reached the age of such responsibility that he should be intelligently conscious of the want of right to tamper with an instrumentality belonging to another and not apparently abandoned or valueless, or where the child meddles with the instrumentality in a spirit of bravado. But even if such a condition does not exist and the infant is at the age that is described as "of tender years," is ignorant of the danger, lacking in intelligent consciousness of lack of right to trespass, the instrumentality is uncommon, unusually dangerous. and attractive, there is also required a probability of harm, so that the duty will not be imposed unless there is such reasonable probability of the presence of children near the instrumentality as to indicate the probability of harm. But even then the difficulties have just begun, for all that is just the weight in one of the pans in the balances, and against those factors must be balanced the interest of the landowner in the enjoyment of his premises or in their economic use, and the social interest, which by reason of the interest of society in the safety of its children urges the imposition of the duty, but in protection of social welfare and economic progress operates as a check to deny imposing a duty in other than

exceptional circumstances and only when the imposition is reasonably feasible, not unduly burdensome, and can be seen to be fairly justified by a fair evaluation of the factors presented in the particular case. And here appears the danger of classifying the infant as an invitee because of the attraction, for the use of this word immediately tends to drive from the mind a due consideration of a necessity of the weighing and evaluation of these other factors which are vital to the problem, with the result that there is a tendency to impose the duty if it appears that the instrumentality was dangerous and some probability of harm to children was apparent. It is true that the law tends to classification because of the repetition of sets of circumstances having certain common factors, but due to the variation in the attendant circumstances found in connection with these common circumstances, we find the usual variation that is presented in negligence cases, so that the decision in one case cannot govern in the decision of another unless the attendant circumstances have been first given due consideration and found not to justify a rational distinction.

So, in these cases we have the question of how uncommon is the instrumentality; how unusually dangerous it is; how attractive is it; what probability is there of children coming in contact with it; whether the probability is localized so that harm can be avoided, or is there merely a high probability that at some time and in some place, children will come in contact with it, with nothing to indicate when and where the contact will come; how feasible is it to avoid danger of harm; how great would be the burden of avoiding or lessening danger of harm, and the effect of imposing such duty. And one outstanding inquiry that is often given scant consideration by the judges is the apparent intelligence of the child, his intelligent consciousness of the circumstances, and that he had reached the age where he would reasonably be expected not to tamper because of his appreciation of danger or appreciation of his want of right to tamper, so that no duty to protect him could reasonably be imposed.

The lack of resolution, ill-considered sentimentality, and sloth and laziness, unfortunately too often displayed even by judges, resulting in abdicating their functions to juries has been vigorously urged by many in repudiation of the doctrine. The argument is potent as a warning, but does not justify a repudiation of the doctrine. It must be conceded that sometimes there is difficulty in weighing and evaluating the factors presented in the cases, but if this duty is not avoided by concealing its necessity by the fiction of an invitation, this difficulty appears much less objectionable than the danger urged, that many judges do not withhold from the jury the power of decision as to what are the facts when there can be no reasonable difference of opinion as to what they are or the evaluation of the factors when there can be no reasonable doubt as to their proper and comparative evaluation, with the consequent result that unjust verdicts are rendered by juries who are not subject to criticism, because they have not violated the instructions of the judge, for the very submission of a case to them is an admission that a finding by them either way is not improper. It can with reason be hoped that the great progress made in recent years in legal thought, training, and education will tend greatly to the correction of this still common evil.

The result reached in the Pollard Case was manifestly correct, and we can readily agree that the ordinary boy of 13 or 14 years of age is at an age where he has such an appreciation of the danger involved in the use of blasting powder that there is no duty to exercise care to avoid it coming into his possession, and, certainly when the circumstances are supplemented by warnings and threats from his parents after it has come into his possession, it becomes clear that regardless of any want of care in permitting it to come into his possession there should be no liability for the harm, for he has thereby been put in such a position that had he been in it before the powder had come into his possession the defendant would have been under no duty to exercise care to avoid it coming into his possession. For another interesting case in which it possibly could not have been said that the children were of an age and had such appreciation of danger that there was not some duty to exercise care, and there might have been liability had the explosives been left in plain sight or readily accessible, possibly in spite of the warning that they were dangerous, yet the care used was such that it made it difficult to obtain the explosives and required an effort upon their part which involved a clear consciousness of inexcusable wrongdoing, so that the case was correctly decided from either viewpoint that the court took, that sufficient care was used, or that no duty was owed to the plaintiffs to make the cartridges more inaccessible, see the opinion by Riley, J., in Empire Gas & Fuel Co. v. Powell, 150 Okla. 39, 300 P. 788. And we agree that when they have to overcome obstruction to possession and tampering ave-

rage children of less than ten years would not be protected.

Before considering the applicability of the doctrine to the present case in the light of all of its circumstances we observe that the defendant comments upon the fact that it does not appear that the Bradshaw boy was attracted upon the premises by observing the caps from without, and that he had already entered before observing them. Some cases have so held, usually where the instrumentality was not visible before entry, and there was otherwise no reason to anticipate the presence of children, and, therefore, not a probability of harm necessary to impose a duty to exercise care, and the defendant may have not only failed to appreciate the distinction but may have also gotten this impression from the fiction that the infants are invitees, and assumed that they could not be invitees if they had entered before being attracted. On that point it might be said that it is the instrumentality that attracts, and if attraction from without could make an entry otherwise wrongful the entry of an invitee, then the invitation to a trespasser to approach the instrumentality would render his presence no longer wrongful. But, abandoning the fiction that the infant is an invitee, and admitting that he is a trespasser, what we are concerned with is probability of harm, and that depends upon probability of tampering, and in the cases that held that the infant must be attracted from beyond the boundary line, if the instrumentality was where it would not be observed until after entry, the instrumentality would not indicate a probability of the presence of children but if there was otherwise a reasonable ground to anticipate the presence of children at or so near the instrumentality that they would then observe it and be led to tamper, the case presents a sufficient probability of harm and imposes a duty if the imposition cannot be denied in spite of the probability of harm. So far as the existence of probability of harm is concerned, the order of the occurrence of the respective factors having to do with it is immaterial if in combination they create it.

So far as the safe-keeping of explosives is concerned, it may be observed that the matter of safe-keeping is something other than the consideration of care in their use for, so far as safe-keeping and custody is concerned, there is a definiteness of location which does not always present itself when the matter of care in use is concerned, and definiteness of location has much to do with definiteness as to probability of harm and especially as to feasibility of and the burden involved in the taking of measures to avert harm, because definiteness of location in connection with probability of harm permits intelligent direction of effort, whereas even a certainty that somewhere and at some time, as for instance, somewhere and at some place along thousands of miles of railroad right of way, some child will be harmed by tampering with explosives set out for use on the right of way to be exploded by a train as a warning, does not permit of any such definiteness as to time or place as to justify the imposition of a duty to watch and guard the explosives anywhere and everywhere and whenever there may be a necessity for their use.

But in this case we have to do with a very definite location of little area, and even considering that the cartridges were brought there for use, even in their use care as to possession was feasible, and when reason for use ceased there remained nothing but the matter of safe-keeping. Such cases present the circumstances urging the imposition of a duty, and there are no circumstances of force in denying it.

All courts recognize the fact that explosives are instrumentalities of the most dangerous character, and that their dangers are unknown to young children, or at least insufficiently appreciated by them to prevent their natural inclination to tamper with them, causing harm, the tampering being probable because of the attractiveness due to noise or fire, or to the attractive appearance of some explosives, and their apparent use in play, such as was the case with the explosives in this case, which were adapted for use as whistles by reason of the open end of the metal barrel. And the rule is that one having explosives in his possession, so far as their safe-keeping is concerned, is under a duty to exercise the highest care to avoid them coming into the hands of children and causing harm to or through them, and it is conceded in the majority of jurisdictions, and conceded in all jurisdictions that apply the doctrine of attractive nuisance, that whether the children are or are not trespassers is immaterial, if there is a reasonable probability of their presence that would create a danger of the explosives falling into their hands. This is not only the generally accepted doctrine, but it is the law even in West Virginia, notwithstanding the decision in the Simmons Case relied upon by the defendant, for in Wellman v. Fordson Coal Company (W. Va.) 143 S. E. 160, the court directly held that it was immaterial whether the children were trespassers or not, and it expressly said that the Simmons Case involved radically differ-

ent facts, so that the holding is that a duty is owed to trespassers in the safe-keeping of explosives, and the Simmons Case held to the contrary only under peculiar facts. For the statement of the rule, generally, and also where a trespass of infants is involved, see: Powers v. Harlow, 53 Mich. 507. 19 N. W. 257; Harriman v. Pittsburgh, etc., R. Co., 45 Ohio St. 11. 12 N. E. 451; Sroka v. Halliday. 39 R. I. 119, 97 Atl. 965, Ann. Cas. 1918D, 961; Mattson v. Minn., etc., R. Co., 95 Minn. 477, 5 Ann. Cas. 498, note, 503; Krachanake v. Acme Mfg. Co.. 175 N. C. 435, 95 S. E. 851, Ann. Cas. 1918E, 340; Akin v. Bradley Eng. & Mch. Co. (Wash.) 92 P. 903, 14 L. R. A. (N. S.) 586; Clark v. Du Pont de Nemours Powder Co., 94 Kan. 268, 146 P. 320, L. R. A. 1915E, 479; Dahl v. Valley Dredging Co., 125 Minn. 90, 145 N. W. 796, 52 L. R. A. (N. S.) 1173; Hercules Powder Co. v. Wolf et al. (Miss.) 110 So. 842; Golden Saw Mill Co. v. Jourdan (Miss.) 127 So. 287; Carter Coal Co. v. Smith (Ky.) 191 S. W. 631; Anderson v. Newport Mining Co. (Mich.) 168 N. W. 523; Butrick v. Snyder (Mich.) 210 N. W. 311; Vills v. Cloquet (Minn.) 138 N. W. 33; Wellman v. Fordson Coal Co. (W. Va.) 143 S. E. 160; Kennedy v. Ind. Quarry & Con. Co. (Mo.) 291 S. W. 475; Little v. James McCord Co. (Tex.) 151 S. W. 835; Folsom-Morris Coal Mining Co. v. De Vork, 61 Okla. 75, 160 P. 64; City of Tulsa v. McIntosh. 90 Okla. 50, 215 P. 624; Cherry v. Arnwine. 126 Okla. 285, 259 P. 232; Town of Depew v. Kilgore, 117 Okla. 263, 246 P. 606; and numerous other authorities cited in the above cases.

The remaining contention urged in support of the demurrer is that the negligence was not the proximate cause of the harm. The argument has to do with circumstances subsequent to the finding of the caps by the Bradshaw boy. The word proximate does not mean that the negligence must be the nearest cause factor in time or place with reference to the harm, the relative order of occurrence of cause factors not being determinative, but the problem depends upon the relative weight of the factors. It is commonly said that although the harm is within the bounds of the natural and probable consequences of the want of care, yet the negligence is not the proximate cause if there is an independent, intervening efficient cause, or the independent, intervening conduct of a responsible human agency, which is an effective cause. These terms mean nothing except as they are further defined by the opinions in which they are used to determine what the court had in mind.

It is the law that negligence creating a condition utilized by another to bring about intentional harm, where there was no ground to anticipate it in the particular case, is not the proximate cause of the harm. While it may be true that but for the negligence the harm would not have occurred, the relative weight of the factors from a reasonable point of view is such that it is fair to say that the intentional causing of harm is the real cause and that the negligence created only a condition making it possible. Of course the negligence is in the line of causation from a strictly scientific point of view, but while it was an essential factor in causation, it is not considered as an efficient or a responsible or proximate cause.

But the present case does not present an instance of such an independent, intervening cause, nor of what can properly be termed an independent. intervening cause which is the conduct of a responsible human agency, which is often the description given of the factor that denies to the original negligence the efficiency of a proximate or efficient or responsible cause.

The conduct of the intervening human agencies was not wholly independent, for they were forced into the environment. They are charged merely with not acting to avoid the harm. Had they been strangers they could not be charged with any duty. But being the parents of children having possession of the instrumentalities, they were put by the negligence of the defendant in a position where it would have been their duty to act to avoid harm to or through the infant had they known that the infant possessed dangerous instrumentalities. Mr. Parsons did not even know what his boy had, or that they were dangerous. As to Mr. Bradshaw, it might be argued that he was negligent (although it does not appear so to the writer) in not ascertaining what his boy had after his suspicions were aroused. But he was engaged with his work, the cartridges had the appearance of discharged 22-caliber shells from which the bullets had been discharged, and he got the impression that what the boy had was something that had been discharged and dismissed the matter from his mind. We are not concerned with whether he was negligent and would be liable to the plaintiff. but with whether the defendant is liable. Mr. Bradshaw was under no duty to the defendant to avoid the consequences of its negligence. If we concede that his conduct was negligent, it was at most negligence in not ascertaining that what the boy had was dangerous. It cannot be considered as negligence in not taking the explosives from the boy with knowledge that they were dangerous instru-

mentalities. The necessity for his giving the matter consideration at all was due to the negligence of the defendant. That he would not know that his boy had something dangerous, even though his suspicions were once aroused, is not so improbable or extraordinary a factor as to permit this conduct to be classed as .an independent, intervening efficient cause. It cannot deny to the negligence of the defendant the efficacy of a responsible or proximate cause.

While usually the question of proximate cause is one of fact for the jury, when the facts are such that the judge can conclude that reasonable men could not differ in their conclusion, he will pass upon it as a question of law. Since the evidence would not justify a conclusion stronger than we have recited, we hold as a matter of law that under the evidence the negligence of the defendant was the proximate cause of the harm. Oklahoma Civil Digest, vol. 4, Negligence, sec. 14, pp. 2164-2167; Complete Oklahoma Digest, vol 3, Negligence, sec. 65, pp. 892 et seq.

■ The complaint that the court failed to instruct on the doctrine of proximate cause is untenable, since we have held that the negligence of the defendant was the proximate cause of the harm.

The defendant also complains of certain instructions that were given.

■ He first complains of an instruction that usually one must be himself free from fault to recover for the negligence of another, but that such doctrine does not apply to an infant of tender years. The objection is that contributory negligence was not in issue. Then the instruction was harmless.

■ The defendant also complains of error in instructing the jury that they should not impute the negligence of another to the plaintiff. That was a proper instruction, for the doctrine of imputed negligence as between parent and child has been rejected in this jurisdiction. A., T. & S. F. Ry. Co. v. Calhoun, 18 Okla. 75, 89 P. 207. If the negligence of the parent could have had any other bearing, an instruction as to that would have been proper, but that would not make the above instruction erroneous. The defendant was not entitled to an instruction as to the parent's conduct being a proximate cause, as we have already held.

■ ■ The defendant also complains of an instruction in which the jury was instructed that if they found the defendant liable, they should consider, among other things, the effect that the plaintiff's injuries would have on his ability to earn a livelihood after he had reached the age of 21 years. The ground of error urged is that impaired earning capacity must be specially alleged and proved, and the defendant cites Kennedy v. Van Horn, 77 Okla. 100, 186 P. 483, and it replies to cases cited by the plaintiff that they were cases where it was clear from the extent of the harm that earning capacity was impaired, which was not true in this case. This is answered by the plaintiff by complaining that the defendant did not complain that the verdict was excessive. It appears from the record that it was excessive, and it seems that this erroneous instruction entered into its being excessive, so that we cannot consider the error harmless. The authorities cited by the plaintiff all are professedly based upon a finding that the record did not show the judgment to be excessive, so that the error did not appear to be harmful. Since the case must be tried again, it occurs to us that it is highly speculative to contemplate that the plaintiff's earning capacity will be at all impaired by his injuries. Considering his age, that he had not started or had not much more than started in school, that many vocations are such that the damage will not at all impair earning capacity, and it cannot be told what he will follow, but it would be supposed that he would follow one in which his earning power would not be affected, the item should be wholly eliminated from consideration.

In our opinion there would be no reason for granting the defendant a new trial as to the whole case. The excessive feature of the verdict does not indicate passion or prejudice and was apparently due to the erroneous instruction. The issues having to do with the existence of the cause of action were thoroughly tried out and the verdict was well warranted by the evidence. Had there been any indication of passion or prejudice or in a case reversed because of the smallness of a verdict it appeared that the very rendition of it for a plaintiff was because of a compromise, we would rarely reverse a judgment without ordering a new trial of the whole case, for we could not be satisfied that the finding of facts as to the existence of the cause of action did not depend upon passion, prejudice, or compromise, unless the evidence should be very clear that the plaintiff was entitled to recover. But here we see no necessity of the expense of the trial court again going over the matter of whether the defendant is liable. That has been done. It has been done also upon appeal. Neither court should be put to further expenditure of time or expense with that feature. The defendant has had its day

in court, in fact in two courts, upon the existence of the cause of action.

While there has been some difference of opinion in the past as to the power of a court to do this, the power is conceded in the great majority of jurisdictions, either by common-law decisions that distinguished or repudiate the early English decisions, or under statutes. The English decisions holding that it could not be done were based upon the conception of a verdict, as expressed by that court, that it is indivisible, which is correct as to parties where a liability must be joint if it exists. But as far as concerns cases of several liability such an indivisibility would not be applicable in this jurisdiction and a verdict is merely a sum total of facts necessary to sustain a cause of action and to assess damages. There is a pretty clear line of demarcation between the facts constituting the cause of action and the facts showing amount of damage. We have rejected the doctrine that a verdict is indivisible by permitting a plaintiff to remit part of the judgment and let the judgment stand for the remainder where there was a liquidated amount clearly ascertained which could be remitted to make the remainder a proper recovery in amount. There is no difference in principle between that and permitting the judgment to stand as res adjudicata on the cause of action and granting a new trial as to damages when they must be liquidated by a jury. The power to grant a new trial only to assess damages would be justified either by the better view of the common-law powers which accords with the majority view in this country, or under the statutory power to reverse, vacate, or modify judgments, which is the ground relied upon in some jurisdictions holding that a statutory power exists. In fact, we have permitted a verdict to stand in a negligence case as res adjudicata on the existence of a cause of action, and reversed it for a new trial merely for the assessment of damages. Curtis & Gartside v. Pigg, 39 Okla. 31, 134 P. 1125. In that case the trial court would have been justified in directing a verdict for the plaintiff, but that is not necessary situation under the authorities, although the power is one to be carefully exercised. As to the power and its exercise, see: Smith v. Whittlesey, 79 Conn. 189; 7 A. & E. Ann. Cas. 114, and note, 116-118; Simmons v. Fish, 210 Mass. 563, 97 N. E. 102, Ann. Cas. 1912D, 588, and note, 593-595.

We have not discussed the authorities cited by the defendant on the issue of proximate cause, because the defendant showed only the usual abstract extracts which give no information as to what were the facts in the cases. The Pollard Case is clearly distinguishable from the present case. The defendant's attempts to distinguish the plaintiff's authorities by differences in place of harm are unsound. The defendant contended that Mr. McGahey was an independent contractor. It did not indicate just why it made that assertion. He was an independent contractor who agreed to drill a well over a cellar which the defendant was to dig, and the caps were obtained by defendant's workmen for use in digging the cellar.

The judgment is reversed, with directions to the trial court to grant the defendant a new trial only for the assessment of damages, and to enter a judgment for the plaintiff thereafterwards for the amount so properly assessed.

RILEY, HEFNER, CULLISON, ANDREWS, McNEILL, and KORNEGAY, JJ., concur. LESTER, C. J., and CLARK, V. C. J., absent.

Note.—See under (3, 4), annotation in 14 L. R. A. (N. S.) 586; 19 L. R. A. (N. S.) 1127; 24 L. R. A. (N. S.) 1258; 42 L. R. A. (N. S.) 840; 43 A. L. R. 434; 49 A. L. R. 160; 60 A. L. R. 1071; 11 R. C. L. 664; R. C. L. Perm. Supp. p. 2972; R. C. L. Pocket Part, title Explosions and Explosives, § 17. (5), 22 R. C. L. 148, 149; R. C. L. Perm. Supp. p. 5186; R. C. L. Pocket Part, title Proximate Cause, § 31.