**BERNHEIMER et al. v. VURPILLOT.**

No. 1402.

District Court, E. D. Pennsylvania.

Jan. 14, 1942.

Thomas Raeburn White and White & Staples, all of Philadelphia, Pa., for plaintiffs.

Philip H. Strubing and Evans, Bayard & Frick, all of Philadelphia, Pa., for defendant.

BARKSDALE, District Judge.

This is a civil action instituted by the plaintiffs, against the defendant, for damages for personal injuries alleged to have been sustained by the plaintiffs as the result of the negligent operation of an automobile by the defendant, in this District. The complaint alleges that the "plaintiffs are both citizens of the German Reich, temporarily residing in the Commonwealth of Pennsylvania", and that defendant is a citizen and resident of this district. The citizenship of the defendant, as thus alleged, is admitted by defendant's answer, and the citizenship and residence of the plaintiffs as thus alleged is not denied by the defendant.

The action was instituted on February 28, 1941, a time when the United States and Germany were not at war. While this action was still pending and undetermined, a state of war between the United States and Germany was recognized by resolution of the Congress of the United States on December 11, 1941. This action having been now matured, and having been set for trial at an early date in this court, the defendant comes and moves the court to strike the case from the trial list on the ground that the plaintiffs are alien enemies and therefore not entitled to avail themselves of the judicial processes of the courts of the United States.

The defendant's counsel relies upon the very recent case of Ex parte Don Ascanio Colonna, 62 S.Ct. 373, 86 L.Ed. ——, decided by the Supreme Court January 5, 1942. This was a case where the petitioner, the Royal Italian Ambassador, sought leave to file in the Supreme Court a petition for writs of prohibition and mandamus, seeking to regain the possession of a vessel and its cargo of oil, then in possession of the United States District Court for the District of New Jersey, upon the ground of the sovereign immunity of the Italian Government from suit. The Supreme Court refused to entertain petitioner's application, a state of war between the United States and the Italian Government then being in existence. The Court said:

"After the motion was filed, there occurred on December 11, 1941, the declaration that the United States is at war with Italy. Section 2(b) of the Trading with the Enemy Act, 40 Stat. 411 [50 U.S.C.A.

Appendix § 2(b)], defines 'enemy' to include the government of any nation with which the United States is at war. Section 7(b) contains the following provision, 40 Stat. at page 417 [50 U.S.C.A. Appendix § 7(b)]:

" 'Nothing in this Act shall be deemed to authorize the prosecution of any suit or action at law or in equity in any court within the United States by an enemy or ally of enemy prior to the end of the war, except as provided in section ten hereof (which relates to patent, trademark and copyright suits) * * * And provided further, That an enemy or ally of enemy may defend by counsel any suit in equity or action at law which may be brought against him.'

"This provision was inserted in the act in the light of the principle recognized by Congress and by this Court that war suspends the right of enemy plaintiffs to prosecute actions in our courts."

Plaintiff's counsel, resisting the motion, contends that the Trading with the Enemy Act and the common law, while denying the processes of our courts to an enemy government, or an enemy subject when resident in enemy country, do not deny the processes of our courts to a peaceful, law-abiding citizen of an enemy nation resident in the United States, citing Krachanake v. Acme Manufacturing Co., 175 N.C. 435, 95 S.E. 851, L.R.A.1918E, 801, Ann.Cas.1918E, 340, and Speidel v. N. Barstow Co., D.C., 243 F. 621.

The question here presented, to my mind, is not a simple one. The principle, that one nation can, and usually does, during time of war, deny the processes of its courts to citizens of enemy countries, is an ancient one. Indeed, there seems to be no doubt that one nation may confiscate, for its own uses, the debts owed by its citizens to alien enemies during time of war, although it is doubtful whether this right has been exercised in modern times. However, it has long been customary for one nation to deny to citizens of an enemy nation the assertion of their peacetime rights, during the existence of a state of war, when such would be of assistance to the enemy nation in the prosecution of war. "We suspend the right of the enemy, says Mr. Chitty, to the debts which our traders owe to him, but we do not annul the right. We preclude him during war from suing to recover his due, for we are not to send treasure abroad for the direct supply of our enemies in their attempt to destroy us, but with the return of peace we return the right and the remedy." Hanger v. Abbott, 6 Wall. 532, 536, 537, 18 L.Ed. 939. It may be stated generally that in time of war no nation will permit a citizen of an enemy country to use its courts in any way which might be hurtful to it, or helpful to the enemy, in the prosecution of the war.

But it has been held that a citizen of an enemy country peaceably residing in this country during time of war may maintain a purely personal action here, where no possible benefit could inure to the enemy nation thereby. Krachanake v. Acme Mfg. Co., supra. See note "Alien enemies as litigants.", L.R.A.1918E, 809.

In the case of Porter v. Freudenberg, 1915, 1 K.B. 857, 866-880, Lord Reading undertook "to examine the law relating to proceedings in the King's Courts by or against alien enemies during a state of war", and to review the authorities pronounced during the Napoleonic wars and the Crimean War. Lord Reading concluded that "Alien enemies have no civil rights or privileges unless they are here under the protection and by permission of the Crown: Blackstone 21st ed., vol. 1, c. 10, p. 372." He was of the opinion that the matter of residence was of great importance, holding not only that an enemy subject residing in an enemy country had no right to maintain an action in a British court, but also that not even a British subject could maintain an action in a British court if he voluntarily resided and did business in enemy country in time of war. On the other hand, he was of the opinion that an enemy subject might be permitted to maintain an action in the British courts if he peaceably resided in British territory under the protection of, and by permission of, the Crown. However, this right depended upon the permission of the Crown, as he recognized "the ancient rule of the English common law that an alien enemy, unless with special license or authorization of the Crown, has no right to sue in our courts during the war".

I think it may be assumed here that plaintiffs are in this country by the permission of, and possibly under the protection of, our Government, but there still remains to be determined in the situation existing at present, whether or not there is "license or authorization", on the part of our Government for these plaintiffs to maintain an action in our courts. It is, therefore, necessary to examine the attitude of this nation

as a sovereign toward German subjects, and particularly these plaintiffs, now resident in this country.

█ Under the definition of "enemy", as set out in the Trading with the Enemy Act, supra, these plaintiffs do not fall within that category unless included by proclamation of the President. I find no proclamation as yet proclaimed by the President under the terms and authority of the Trading with the Enemy Act, and I am therefore of the opinion that the provisions of that Act have no application to this action at this time.

However, by proclamation of the President of the United States on December 8, 1941, No. 2526, pursuant to Section 21 of Title 50 of the United States Code, 50 U.S.C.A. § 21, "all natives, citizens, denizens or subjects of Germany being of the age of fourteen years and upwards who shall be within the United States * * * are termed alien enemies * * *." This proclamation further sets out that all alien enemies shall be liable to restraint, or to give security, or to remove and depart from the United States, and provides by reference strict regulations for their conduct.

Shortly after our entry into the war with Germany and Austria-Hungary in 1917, there were similar proclamations which included the following, the language being substantially identical in both proclamations: "* * * and so long as they shall conduct themselves in accordance with law, they shall be undisturbed in the peaceful pursuit of their lives and occupations and be accorded the consideration due to all peaceful and law-abiding persons, except so far as restrictions may be necessary for their own protection and for the safety of the United States: and towards such alien enemies as conduct themselves in accordance with law, all citizens of the United States are enjoined to preserve the peace and to treat them with all such friendliness as may be compatible with loyalty and allegiance to the United States." 40 United States Statutes at Large, Part 2, page 1650, as to Germany, and 40 United States Statutes at Large, Part 2, page 1772 as to Austria-Hungary.

In the Presidential Proclamation of December 8, 1941, although there is a recital that the proclamation includes directions as to "the conduct to be observed on the part of the United States to all natives, citizens, denizens or subjects of Germany * * *", *no such provision as that above quoted from the Proclamation of 1917 is therein contained.*

In permitting a citizen of Austria-Hungary, resident in this country, to maintain his suit in 1918, the Court, in Krachanake v. Acme Mfg. Co., supra, based its holding, in large measure, upon that provision of the 1917 Proclamation quoted above.

I cannot escape the conclusion that omission of such a provision is of paramount significance. In the 1917 Proclamation, it is provided that alien subjects shall "be accorded the consideration due to all peaceful and law-abiding persons, except so far as restrictions may be necessary for their own protection and for the safety of the United States; * * *" In the 1941 Proclamation, German subjects, including these plaintiffs, are denominated as alien enemies, and the provision that they be accorded the consideration due to all peaceful and law-abiding persons is significantly omitted.

I find no other Presidential Proclamation nor Act of Congress bearing on this subject.

In the light of well recognized rules of construction, the omission of the above quoted provision of the 1917 Proclamation from the 1941 Proclamation must be construed as the deliberate intent on the part of our Government at this time to impose greater restrictions upon subjects of enemy countries resident here than were imposed in 1917. It is entirely reasonable to assume that this action was well considered. Our enemies have declared that this is Total War, while in 1917–1918 some of the amenities of civilization were preserved. It is only natural that our Government should grant fewer privileges now than in 1917 to citizens of countries which have declared that it is their deliberate purpose to altogether destroy us and our allies.

█ It therefore seems to me that the privilege of prosecuting their cause of action must be denied to these plaintiffs at this time. Their right of action should not be prejudiced, but it is my conclusion that this action must be stayed for the duration of the War or until these plaintiffs are accorded the privilege of prosecuting their cause of action, either by Act of Congress, or by Proclamation of the President, who has the power under 50 U.S.C.A. § 21 to "direct the conduct to be observed, on the part of the United States" toward aliens. An order will be entered accordingly.