## ALLIGATOR CO. v. DUTTON.
### No. 11417.

Circuit Court of Appeals, Eighth Circuit.
Feb. 23, 1940.

George E. Heneghan, all of St. Louis, Mo., on the brief), for appellant.

Lucien B. Barton, of Louisville, Ky. (Joseph J. Goodman, of St. Louis, Mo., on the brief), for appellee.

Before GARDNER and WOODROUGH, Circuit Judges, and MOORE, District Judge.

WOODROUGH, Circuit Judge.

The Alligator Company appeals from a judgment rendered against it for damages for personal injuries suffered by Jene Dutton, a nine year old boy who was burned by a highly inflammable waste product which the company had left accessible to him and other playing children. It was alleged that negligence of the company was the proximate cause of the injuries and the recovery was upon that ground. Diversity of citizenship and jurisdictional amount involved were shown and the federal jurisdiction vested upon removal of the cause from the state court.

There was substantial evidence to show that: Jene Dutton was burned while playing in a cave located on a vacant lot behind the Alligator Company's plant at 4171 Bingham Avenue, St. Louis, Missouri. Sometime before the day of the accident, November 23, 1936, the cave roof had collapsed, leaving an open 8 x 8 foot hole about 5½ feet deep. Jene Dutton, age 9, Jack Dutton, his brother, age 11, and Wilbur Womack, age 12, were children of the neighborhood who played in and about the cave. At the time of the accident Jene Dutton was warming himself before a fire built in one corner of the cave where some potatoes were being cooked. The lot was unimproved, a weed-grown and rubbish scattered area in the center of the St. Louis 4100 block between Bingham and Meramec, off Gravois. Industrial plants and property shut the lot off from view from Bingham Street, but on the Meramec side passersby could see into the lot past the small houses built there, such as the Dutton's six room structure, and also across unoccupied residence lots. Children could be seen playing on the lot daily, sometimes as few as three, sometimes as many as twenty five used the lot as a playground, for football, taggers and release, for hunting snakes, and on cold days for building fires. The owner of the lot, the Missouri Portland Cement Company, made no use of the lot, posted no "Keep Off"

Claude O. Pearcy, of St. Louis, Mo. (Bishop, Claiborne & Heneghan and

signs and did not instruct the children to keep away or the police to "run them off". The children had no other local playground except the city streets.

The size of the vacant lot was variously estimated to be 120 feet by 120 feet, up to 250 feet by 200. A coal yard and a fenced orchard formed boundaries. The cave was situated off the center of the lot about three-sevenths of the straight line distance from the rear of one of the Meramec houses, the Sexton's, on the north, to the rear line of the Alligator Company's property on the south. At the time of the accident the company maintained an incinerator having a chimney sixty feet high located some twenty feet to the rear of its plant and its custom was to set down two or three five-gallon buckets of the waste product of its manufacture some four to eight feet behind the chimney to use for building fires. The company's property line nearest that point was not marked or distinguishable.

The waste material was the residue of the company's raincoat cloth processing; after the cloths were treated with the company's secret fluid in tanks, the cloths were removed and the fluid drained out for reuse. Before another batch could be processed in the tanks, it was necessary to rinse the tanks with naphtha and to rub the tank walls with naphtha-soaked rags. The rags and cleaning drainage were then put in five-gallon buckets which were taken to the boiler room and to the incinerator. At the incinerator the buckets were left covered and held down by brick or tile set on top of the cover. The company employees who used the material to make fires in the incinerator could be seen at their task by the children on the lot. These men and other company employees could and did see the children playing on the lot and could have observed the fires which the children frequently made. But no attempt was made to protect the buckets or to warn the children about the waste material which looked like an ordinary heavy dark oil. The oil was in fact highly combustible, a semi-explosive. It had a flash point of 95 degrees Fahrenheit, a percussion rate of 1,300, and burned steadily at 113 degrees. Although only 8 per cent of the fluid was the paraffin naphtha-benzene, analysis showed that the explosive contents of the material were strong enough, should a tomato can of the substance come into contact with the fire, to throw the can ten to fifteen feet into the air. The material was left in the buckets unwatched on the vacant lot or on the contiguous property of the Company, where it was readily available.

November 26, 1936, Wilbur Womack, home from school and out playing on the lot with the Dutton boys, went over to the buckets and filled a tomato can with the waste material. Wilbur took the can over to where Jene Dutton stood in the cave, warming himself by the fire. Wilbur told Jene to throw the contents on the fire, "it would make it burn quicker". Wilbur thought the contents were an ordinary oil, and so did Jene. Jene was putting some potatoes in the fire when Wilbur brought the oil up, so Jene said he would not put the oil on then, but would in a minute. Wilbur set the can down on the ground above the cave in a level spot some four or five feet from the edge. Wilbur turned again to his play with Jack Dutton and thereafter the can was blown by the wind or otherwise rolled or thrown into the fire. The can shot up in the air with a whishing noise and a flash was seen by a coal yard employee and also by Mrs. Sexton, the nearest neighbor. Jene's clothes caught fire and he rolled on the ground, while his brother tried to extinguish the flames with his cap. Jene ran screaming to a near neighbor's house, the Connor's, where Mrs. Connor put baking soda on his burns. Wilbur went to get Jene's father, who with Mr. Connor took Jene to the hospital. Jene's burns were found to be serious, of both first and second degree. Narcotics were administered to ease his pain; he was given blood transfusions and skin grafting was performed. He was not discharged from the hospital for several weeks.

Plaintiff's theory was that the company was negligent in leaving the dangerous waste material where the children could get it; the theory assumed that the can of oil was blown or tipped by the wind into the fire. Many witnesses, including the policemen who investigated the case, testified for plaintiff, describing the cave and the weather conditions, including the degrees of wind and cold, and the vacant lot and surrounding area. An expert gave an analysis of the waste fire-building fluid. Each of the three boys gave his account of the accident. Mrs. Sexton and an employee of the coal yard told about seeing the can shoot up in flame. Mrs.

Connor and Mr. Dutton described the first aid efforts, and hospital attendants, the nurse and doctor, described medical treatment. The hospital admission cards described the accident as occurring when "Nine year old boy was playing in a cave with fire and his clothes caught fire." In the report that he "was exploring a cave this afternoon with some comrades when a candle he was carrying ignited some oil carried by another boy". The reports noted he was in acute pain and under influence of MS. The doctor testified that the boy had not fully recovered at the time of the trial.

The company demurred to plaintiff's evidence, and when this was overruled introduced evidence on its behalf. The United States Weather Bureau expert testified that at the hour of the accident the wind was blowing at an average of 18 miles per hour. Company employees testified as to how the fluid in the buckets was obtained, but no expert was called to refute the analysis made by the chemist called by the plaintiff. Company employees testified that the buckets were kept on the company's property, but one of them testified that the buckets were kept eight feet beyond the incinerator toward the vacant lot, and another testified that a fence which the company put up on its rear line after the accident was only four feet beyond the incinerator. At the close of all the evidence the company made a request for special findings and for instructions which were denied. It made a motion for a directed verdict which the court withheld for consideration pending the jury verdict. The case was submitted to the jury on two special questions:

1. Under all the facts and circumstances in evidence, was the defendant negligent in placing the buckets and their contents where the evidence shows they were kept?

2. If the above question be answered in the affirmative: Do you believe that a reasonably prudent person should, under all the circumstances shown by the evidence, have foreseen that an accident such as this might reasonably be expected to occur?

The jury returned a verdict for Jene Dutton in the sum of $6,000 and the court subsequently overruled the company's motion for directed verdict. In an opinion rendered upon the denial of motion for directed verdict, the trial court stated that the plaintiff had no desire to rely upon the attractive nuisance or turntable cases as usually understood, as an affirmative cause of action and ground for judgment, but that the doctrine was relied upon only to rebut the defense of trespassing: "The question of proximate cause, like that of due care, should not have been submitted to the jury had it not been that the 'attractive nuisance' doctrine removed the two boys from the classification of trespassers when they took the naphtha, [and] took from defendant the protection of the rule relieving it of any responsibility to anticipate injury from a trespass on its property, and imposed a duty to anticipate and guard against accidents which might reasonably result from keeping the naphtha at the place and in the manner it was kept."

On this appeal the company contends that there was no sufficient evidence to raise a question for the jury on the issue of negligence, that the law of attractive nuisance was not applicable and that even if the company could be found negligent, there was no causal connection between the negligence and the injury. It contends further that the fluid was not dangerous or an instrumentality which was allowed to escape within the doctrine of Rylands v. Fletcher, [1868] L.R. 3. H.L. 330.

On the issue of the company's negligence, the questions concern the nature of the fluid, and where and how it was kept. There is no contention that it was kept as an attractive nuisance within the usual concept of that doctrine. The case does not present an instance where there were attractive but dangerous conditions upon an owner's premises as in the case where an acid pool was maintained on premises accessible to children. United Zinc & Chemical Co. v. Britt, 258 U.S. 268, 42 S.Ct. 299, 66 L.Ed. 615, 36 A.L.R. 28. Jene Dutton was not enticed onto the property of the company by the fluid, nor was he injured there.

By way of preliminary it may be stated that it was not sought to hold the company liable on the theory that it had maintained an attractive nuisance,[1] nor would it be held liable on that ground in this court. The decisions in Missouri con-

---

[1] See Butz v. Cavanagh, 137 Mo. 503, 38 S.W. 1104, 59 Am.St.Rep. 504, 1 Am. Neg.R. 299; Porter v. Anheuser-Busch B. Ass'n, 24 Mo.App. 1.

trolling upon us are clear to the effect that the doctrine as it has been exemplified in the turntable cases is not to be extended. Kelly v. Benas, 217 Mo. 1, 116 S.W. 557, 20 L.R.A.,N.S., 903; Howard v. St. Joseph Transmission Company, 316 Mo. 317, 289 S.W. 597, 49 A.L.R. 1034; see and compare Hull v. Gillioz, Mo.Sup., 130 S.W.2d 623. The cause of action here was based upon the claim that the company was negligent in not guarding a dangerous substance of an explosive nature and that such negligence was the proximate cause of injury. Plaintiff makes no charge that the company or its agents used the dangerous instrumentality in any manner to release some force which injured a bystander, nor that the company failed to restrain some force upon its property which, like a reservoir of water or a fire or wild animal, had a propensity to escape from the company to the plaintiff's damage. Plaintiff relies upon the contention that the owner of an explosive must keep it safely stored, that the possessor of a dangerous instrumentality cannot place it in the hands of, or make it readily available to, someone who is not advised of its dangerous characteristics, or who is, like an infant, incapable of using it with due care, and that the danger inherent in the substance imposes the duty to exercise a high degree of care in keeping it out of the hands of those who it may reasonably be foreseen might innocently use it to the injury of themselves or others.

■ The fluid of the company used for building fires was not kept safeguarded in any manner; a waste product, it was left in a state of virtual abandonment. The buckets which contained the fluid were set down and left near the border line of the company's property. The testimony of company employees would justify the jury passing upon the question of the company's negligence in concluding that the buckets were not on the company's property, some four to seven feet from its incinerator, but that they were on the vacant lot, some eight feet away. The company employees did not agree on where the line was, and the terminus of the property was indistinguishable from that of the adjacent unimproved lot. The children were not trespassers upon the lot, but were there permissively. Davoren v. Kansas City, 308 Mo. 513, 273 S.W. 401, 405, 40 A.L.R. 473; Williams v. Springfield Gas Company, 274 Mo. 1, 202 S.W. 1. The material in the buckets was readily available, and if it was sufficiently dangerous the company was liable for any reasonably foreseeable injury which resulted from the children's taking it. Any trespass committed by the children in obtaining the substance was immaterial.

In Kansas City ex rel. Barlow v. Robinson, 322 Mo. 1050, 17 S.W.2d 977, the defendant kept dynamite caps in his basement, which had a toilet room open to the use of street car employees. Children entered the basement through the access to the toilet room and prowled through the unlocked portion of the basement where the caps, set on wires, were stored. The children thought that the caps and wires were abandoned radio wires and took some of them; plaintiff, a child, was subsequently injured when one of the caps was detonated by a magneto. The Supreme Court of Missouri affirmed a judgment for the plaintiff, saying, 322 Mo. loc.cit. 1062-1063, 17 S.W.2d loc.cit. 983,

"It is the contention of defendants that, in entering the basement room, the boys were mere licensees and that the record is without proof that the premises were attractive to children, resulting that the instruction proceeding on that theory is erroneous.

"The record develops that there was a toilet in the basement where the dynamite caps were left, which was used by street railway employees and which was unlocked and unguarded. It is common knowledge that children are likely to go to such places. It is also common knowledge that children are likely to become attracted to abandoned radio wires such as these children believed the fuses and caps to be. Others used the basement besides defendants. They should not only have anticipated that immature children were likely to go to the unguarded and unlocked basement thus used by street railway employees, but they should especially have anticipated that immature children were likely to prowl thereabout and find the explosives negligently left in the basement. We think the evidence justified the instruction."

The Supreme Court of Missouri did not discuss the refinement of legal theory, whether the defendant was liable in spite of the child's trespass and conversion of the caps because the caps and fuses were attractive, or whether defendant was liable because of the duty to safeguard the caps under circumstances where such conduct

could be anticipated. Both theories proceed from the same basic reasoning and either sustains the trial court in its ruling here that the company was not entitled to a peremptory instruction because the children secured the fluid by trespass or conversion. The jury verdict that the company was negligent in its keeping of the fluid necessarily implied that there was attraction in the presence of the fluid under all the circumstances.

In Kennedy v. Independent Quarry & Construction Company, 316 Mo. 782, 291 S.W. 475, the plaintiff, a boy of twenty, was hurt by a dynamite cap which his companion, a boy of twenty, exploded. The cap had been taken out of a tin box from the company's shed in the quarry by a boy of over eighteen years of age. The Supreme Court of Missouri reviewed the precedents in its own court and in other jurisdictions and affirmed a judgment which had been directed for the company. But the ground of decision was that the boy was of a mature age and his act was one for which he was accountable. "With him it was not merely the inclination of a child to play with an attractive object coming in his way, but rather a wrongful appropriation, consciously made of things which, as he expressed it, he had 'no business with.' " 316 Mo., loc.cit. 791, 291 S.W. loc.cit. 477. The court prefaced its discussion of proximate cause with the statement, "Holding, as we do, that under the evidence the question whether the box of caps was in the shed through an act of defendant was one for the jury, certain general principles * * * may be stated." It concluded after the discussion, "Under all the circumstances shown, we conclude that the essential failure of the plaintiff's case is in the intervention, between defendant's alleged negligence and plaintiff's injury, of the acts of the persons named, other than defendant, not reasonably to be anticipated by defendant, and of a character which made the original negligent act of defendant remote, and superseded it."

In the present case the children were all of tender age and the cases reviewed by the court tend to sustain the liability for injury inflicted upon them through dangerous agencies negligently left accessible to them.

In respect to the child's act of taking the company's waste product from the company's bucket in the case at bar, we think greater blame would attach for taking the caps in the Quarry case. The caps had real and apparent value, while the oily fluid here involved was a mere waste product left out on a vacant lot and constantly replenished from other waste. If there was any trespass in the present case the trespass is highly technical, a matter of taking a step or two over an unmarked line.[2] The company's fluid was not technically abandoned, but the appearance of abandonment to a child would be a matter of doubt. See Kennedy v. Quarry Company, supra, 316 Mo. loc.cit. 792, 291 S.W. loc.cit. 475; Gerber v. Kansas City et al., 304 Mo. 157, 263 S.W. 432. We do not find that the court erred in refusing to submit to the jury the defense of trespassing as modified by the doctrine of attractive nuisances. The company's keeping of the fluid was negligent if the fluid was in fact dangerous.

The fluid was not explosive to the same degree as dynamite or nitro-glycerin which, respectively, have a percussion rate of about 7,000 feet and 3,000 to 4,000 feet a second as against the rate of 1,300 attributed to the fluid. The expert chemist gave uncontradicted evidence that the fluid did have explosive qualities. While the explosion would be comparatively mild, there would be an explosion and flash fire, or immediate combustion at the proper temperature. The inflammability was rated beween kerosene and gasoline, and the oil content of the substance would burn readily. A tomato can of the substance contained enough flash energy to throw the can ten or fifteen feet into the air. No cases dealing specifically with the care required for safeguarding such substances

---

[2] In Sedita v. Steinberg, 105 Conn. 1, 134 A. 243, 49 A.L.R. 154, the defendant kept an open gasoline tank on his premises, the tank opening upon a part of the premises which defendant owned but which was not distinguishable from a public walk immediately adjacent. A child with a cap pistol came down the walk, and thinking that the fluid he could see at the bottom of the tank was water, shot off his pistol in the tank, causing an explosion which injured him. The trial court directed a verdict for the defendant because of the trespass, but the appellate court reversed and remanded the cause for a jury trial. Cf. Le Duc v. Detroit Edison Co., 254 Mich. 86, 235 N.W. 832.

are cited from the courts of Missouri; the parties rely upon the general law. [3]

The substance here involved was not dangerous in the absence of fire to supply the detonating force. But the evidence established that the boys frequently had fires burning where the company employees could see them, and the jury would be justified in concluding that company employees did see the fires or in concluding that failure to see the fires was gross negligence under the circumstances. The presence of the detonating force was established, and it was a jury question whether the substance was a dangerous substance which required careful keeping. The substance looked like an ordinary oil and its appearance was deceptive in that it gave no warning of its dangerous characteristics. Had it been sold to an adult without warning of the explosive properties, the company might be held liable for injuries resulting from an explosion. Genesee County Patrons Fire R. Association v. L. Sonneborn Sons, Inc., 263 N.Y. 463, 189 N.E. 551; Cabell v. Standard Oil of New Jersey, 110 W.Va. 609, 159 S.E. 49, 51. Kearse v. Seyb, 200 Mo.App. 645, 209 S.W. 635 (where a statutory duty to inspect was violated). In the hands of children not acquainted with the properties of the substance or its proper and safe use, the substance was particularly dangerous. The issue as to the company's negligence was properly submitted to the jury under the authority of Southern Pacific Utilities Company v. Thomas, 4 Cir., 78 F.2d 107, 108, and cases there cited.

In Southern P. Utilities Company v. Thomas, supra, an employee of the Utilities Company cleaned a washing machine with gasoline on the back porch of the house where plaintiff, a child of five, resided. The workmen finished their work while the child was in school during the afternoon, but left the gasoline can on the porch where the child found it on its return from school. The child's mother had used kerosene in building fires, and the child thought that the gasoline was lamp oil which would make the fire burn better. Pouring some gasoline into a fruit jar, the little boy poured this onto the fire, causing an explosion and injury. The trial court submitted the issue of the company's negligence to the jury, and upon verdict and judgment rendered for plaintiff the company appealed, asserting error in the refusal to give peremptory instruction. The court said:

"We agree that in determining what was the proximate cause of the accident, the test is whether the injury was a reasonably foreseeable event, or the natural and probable consequence of the omission of the defendant's workmen. * * * On this point, there is no disagreement. The controversy arises in the application of the rule to the facts of the case. In similar situations it has been deemed pertinent that explosive substances have been left unguarded and accessible to children in a place where they had the right to be, and whither they might be expected to come. Barnett v. Cliffside Mills, 167 N.C. 576, 577, 83 S.E. 826; Krachanake v. Acme Mfg. Co., 175 N.C. 435, 437, 95 S.E. 851, L.R.A.1918E, 801, Ann.Cas.1918E, 340; Richardson v. Libes, 188 N.C. 112, 123 S.E. 306; Stephens v. Lumber Co., 191 N.C. 23, 131 S.E. 314, 43 A.L.R. 426; Hunt v. Rundle, 10 La.App. 604, 120 So. 696; Mathis v. Granger Brick Co., 85 Wash. 634, 149 P. 3; Fisher v. Burrell, 116 Or. 317, 241 P. 40; Jacobs, Adm'r v. N. Y., N. H. & H. R. Co., 212 Mass. 96, 98 N.E. 688, 40 L.R.A. (N.S.) 41; Dahl v. Valley Dredging Co., 125 Minn. 90, 145 N.W. 796, 52 L.R.A. (N.S.) 1173; Carpenter v. Miller & Son, 232 Pa. 362, 81 A. 439, 36 L.R.A. (N.S.) 932.

---

[3] In Kupferle Foundry Company v. St. Louis Etc. Ry. Co., 275 Mo. 451, 205 S.W. 57, 59, the foundry company kept naphtha in an iron tank which was covered by a wood box painted red. The tank and box were located next to the company's building, some ten feet beyond a siding track of the railroad. The railroad negligently operated a car on that track so that a collision with the tank ensued, igniting the naphtha and burning the foundry company's building. The company recovered a judgment against the railroad and on appeal to the Supreme Court of Missouri the railroad contended that the foundry was negligent in its storing of the naphtha. The Supreme Court stated that there was conflict among the authorities as to whether the storage was negligent per se. It continued, "but ordinarily the question as to whether the facts show negligence or a nuisance is for the jury. There is no difference of opinion as to that general rule [citing cases]. The question of negligence in the keeping of the naphtha is for the jury on all the facts in the case, including the fact that the tank was placed as it was, and that no note of its contents appeared thereon."

"Bearing in mind that gasoline is a substance inherently dangerous * * *, we are unable to conclude that there was no actionable negligence in the instant case. We cannot say, as the defendant argues, that there was nothing about the gasoline can to attract the child, or that his conduct was so unexpected that it could not have been reasonably foreseen. Quite the contrary seems to us to be the tendency of the evidence. The workmen had come into the child's own home, bringing with them a volatile liquid, highly inflammable when contact with fire is established. It was noticed that the curiosity of the child and his playmates was provoked by the repairing of the washing machine. Thoughtlessly, the dangerous substance was left behind on the porch of the home where, in the month of May, the child was most likely to spend time in play. What more probable than that he should find the can, or more natural than that in his ignorance he should handle the contents in a manner dangerous to his safety? In our opinion, the District Judge was right in submitting the question to the jury, and the judgment of the District Court is affirmed."

Appellant also presents its contention as follows: "There is no link or causal connection between the act of appellant in placing its waste product in the covered container near its incinerator and the appellee's injury which followed." The contention was similarly expressed in Utilities Company v. Thomas, supra, and is ruled against appellant by the reasoning and conclusion in that case. We have no doubt that there was direct connection between the negligence and the injury. The fluid was left available to children who did not know the dangerous properties of the fluid and might be expected to take the fluid and be injured while exposing it to their fire and causing it to explode. There was no intervening cause or agency between the negligent keeping of the dangerous substance accessible to the children and the explosion except the foreseeable action of the unknowing children.

The company has questioned the sufficiency of the evidence as to the means by which the substance was brought in contact with fire. According to the plaintiff's theory, the can was blown into the fire by the wind. If the accident happened in that manner the company would be liable. If the children, in ignorance of the danger of the substance, set the can so close to the fire that the wind could blow it into the flames or embers, then the company's negligence was connected with the injury in that the children were allowed to obtain a substance which they did not know should be set at a greater distance for safety from the fire. The wind was not an intervening, but a concurring cause.[4] There is no evidence that the wind was unforeseeably strong, as a hurricane or tornado, suddenly arising. The gustiness of the day's wind was a condition under which the boy set down the can.

The company argues that the theory of the wind blowing the can into the fire is improbable. But the tomato can was an abandoned can, and if it was dented or battered it might be upset and roll to the fire, spilling some contents on Jene as it fell into the cave. The theory is not shown to be contrary to physical fact, and alternative theories or speculations as to how the contents were ignited do not favor the company more. Since no intervening causes are established, it makes little difference whether the children caused the explosion by setting the can too near to the fire, by throwing the contents on the fire, or by carrying the can too near a hot fire while exploring in the cave. While according to expert testimony the contents if not heated to 95 degrees Fahrenheit would not be exploded by flame of a candle, the jury was not limited to that account of the course of the explosion. Jene Dutton appears to have accounted for it in that way when he was in his extreme pain at the hospital. But all of the evidence before the jury fully justified the conclusion that the children unwittingly caused the substance to be brought in contact with their fire at the cave.

The instruction which the company requested the court to give the jury on question of the manner in which the fire came in contact with the fluid was as follows: "that the same was ignited by the accidental knocking over of the can containing said liquid into a fire which had been previously built by the said boys at the spot where they were playing."

4 Harrison v. Kansas City El. Light Co., 195 Mo. 606, 93 S.W. 951, loc. cit. 956, 7 L.R.A.,N.S., 293; Brash v. St. Louis, 161 Mo. 433, loc. cit. 437, 61 S. W. 808, citing 1 Sherman & Redfield on Negligence (5th Ed.) Sec. 39.

The verdict in plaintiff's favor was not in conflict with the company's version of the contacting of the fire with the fluid. The verdict rested on substantial evidence and was properly sustained. The trial was fair and we find no error.

Judgment affirmed.