## SHELL PETROLEUM CORPORATION v. BEERS.

No. 26706. Nov. 29, 1938.

Rehearing Denied June 27, 1939.

Geo. W. Cunningham, Ralph J. May, and W. D. Simms, for plaintiff in error.

Champion, Champion & Fischl, for defendant in error.

HURST, J. This action was commenced by Juanita Beers, upon attaining her majority, to recover for personal injuries alleged to have been sustained when she was about four years of age. She had mashed her fingers in a rod line on an oil and gas lease which her father was pumping for defendant, making it necessary to amputate three fingers. Her action was based on the theory of attractive nuisance. The trial resulted in a verdict and judgment in plaintiff's favor, and defendant brings this appeal.

Defendant assigns as error the order of the court overruling defendant's demurrer

to plaintiff's evidence, the order overruling the motion of defendant for a directed verdict in its favor, and the order overruling defendant's motion for judgment notwithstanding the verdict of the jury. In support of these assignments the defendant presents the proposition that "the evidence is insufficient to support the verdict of the jury based on the theory that a rod line and its connections constitute an attractive nuisance." Our inquiry in this regard requires an examination of all the evidence. In this we are required to view the evidence in the most favorable light toward plaintiff's case. Empire Gas & Fuel Co. v. Powell (1931) 150 Okla. 39, 300 P. 788.

There was competent evidence to establish the following facts: For some time prior to the date of the injury, plaintiff's father had been employed by the defendant as a pumper on defendant's oil and gas lease. There were about eight pumping wells on this lease. The defendant furnished plaintiff's father with a house in which to live upon the lease. This house was located about 75 yards from the powerhouse which supplied the power for the pumping of the wells. The lease was not located in the vicinity of any town or city, but there was a private road running north and south between the pump house and plaintiff's house which offered a means of access to the county section line roads. Also there was a path running from plaintiff's house to the pump house, exclusively for the use of the workers on the lease. Extending from the powerhouse for some six to ten feet were iron rods, one for each well. These rods continuously moved back and forth, resting on a "bull pen." which was, in effect, a small fence 12 or 15 inches high running partly around the powerhouse some six or ten feet away. The rods coming from the powerhouse passed over this bull pen and were then connected with rods coming from the oil wells by means of a hook and loop. The hook was connected to the lines coming from the powerhouse, and the loop was attached to the end of the lines leading to the wells. Thus an individual rod line running to a well might be hooked onto rods protruding from the powerhouse, enabling each well to be pumped independently. When a particular well was not being pumped. the rod line running to that well was attached to a stationary rod protruding from the pump house beneath the moving rods. It was obvious that if one's hand became caught between the hook and the loop in connecting the rods, injury would result, and it required but slight effort to bring the hook and loop in contact with each other.

On May 20, 1920, some adult persons discovered plaintiff with her hand caught between the hook and the loop, and it was necessary to disconnect the rod line in order to free her. One finger was entirely severed. and it was necessary to partially amputate two others. The injury was sustained on the opposite side of the powerhouse from plaintiff's house. Two small children were with her at or near the powerhouse at the time of the injury. It appears that plaintiff, together with the other children, had been engaged in playing around the pump house at the time of the injury and plaintiff had some wild flowers in her hand. It is assumed that plaintiff must have attempted to connect the loop and hook as she had seen her father do on previous occasions. There was no fence around the powerhouse. The plaintiff testified that she had no recollection of the injury.

The evidence was to the effect that this connection contrivance was standard equipment and similar in all material respects to the equipment universally used by producers of oil throughout the state, and that in the use of such equipment no guards or fences were ever employed. There was evidence that it would be impractical to construct fences to enclose the rods and connections. It was shown that oil producers generally conducted their pumping operations in the same manner as the defendant was then doing. The evidence was that plaintiff's father instructed her to remain away from the powerhouse, and that the company rules prohibited anyone from going near the powerhouse except those specifically authorized. Also, the evidence was uncontradicted that children had not previously been seen playing at that particular place. The evidence indicates that the defendant did not require the immediate attendance of the pumper or any other person at the point where this connection was placed during all the time the power was in operation.

1. It is first argued that plaintiff was a trespasser, inasmuch as the license to go to and from the house and to live in the house did not include a license to use all of the other premises of the defendant. Under the view we take of this case, it is immaterial whether plaintiff was a trespasser or licensee, but in view of the order

of the company expressly prohibiting anyone other than employees near the pump house, we think it clear that plaintiff was a trespasser. 45 C. J. 742. However, as plaintiff was but about four years of age at the time, she could be guilty of only a technical trespass. Ramage Mining Co. v. Thomas (1935) 172 Okla. 24, 44 P.2d 19.

It is a time-honored doctrine that a property owner owes no duty to trespassers other than to avoid wantonly, intentionally, or willfully injuring them. He is otherwise under no obligation to keep his premises safe for them. But many courts recognize an exception to this doctrine in case of children of tender age where injury or death results from the child trespasser's contact with a dangerous condition of the premises. The English case of Lynch v. Naudain (1841) 1 Q. B. 29, was the pioneer case pronouncing this exception. In 1874 the United States Supreme Court followed by applying the new doctrine to a case of injuries caused by a railroad turntable, allowing the infant plaintiff to recover, even though he was a trespasser. Railroad v. Stout, 17 Wall. 657, 21 L. Ed. 745. Since then innumerable cases have raised the question. Many courts have sanctioned the doctrine, and others have disapproved it, subjecting it to a storm of criticism. However, there is a strong tendency to limit rather than extend the doctrine. 45 C. J. 784; 20 R. C. L. 80, sec. 71. In adopting the doctrine in this state. the tendency to limit it and apply it with caution has been consistently expressed. An exhaustive analysis of the doctrine as adopted in this state appears in City of Shawnee v. Cheek (1913) 41 Okla. 227, 137 P. 724. The formula applied in that case is, in effect, to recognize the general rule restricting liability to intentional, willful, and wanton injuries to trespassers, but to give effect to the doctrine by a further recognition that "a mere omission, although superficially characterized by mere thoughtlessness or heedlessness, but in its deeper explanation, involving a reckless disregard for the safety of merely technical and reasonably anticipated trespassers, such as children of tender years, especially if unconscious trespassers, in respect to obviously and seriously dangerous artificial condition of premises, may amount to wantonness in a landowner." To afford a practical operation of this analysis of the doctrine of attractive nuisance, the court has enumerated certain factors to be considered in determining whether, in such case, there was a reckless

disregard of the safety of others. The judgment was there reversed for the error of the court in overruling a demurrer to the petition, which did not contain any allegations expressly stating or impliedly showing recklessness or wantonness. This case has been referred to as the leading case on this subject in this jurisdiction, and its principles have been consistently followed with divergent results. In the following cases judgments based on the attractive nuisance doctrine were reversed: City of Shawnee v. Cheek, supra; Midland Valley R. Co. v. Littlejohn (1914) 44 Okla. 8, 143 P. 1; Turner v. Durant Cotton Oil Co. (1923) 96 Okla. 31, 219 P. 892; City of Grandfield v. Hammonds (1924) 100 Okla. 75, 227 P. 140; Empire Fuel & Gas Co. v. Powell, supra. In the following cases judgments based on the attractive nuisance doctrine were affirmed: Littlejohn v. Midland Valley R. Co. (1915) 47 Okla. 204. 148 P. 120; City of Altus v. Millikin (1924) 98 Okla. 1, 223 P. 851; Town of Depew, Creek County, v. Kilgore (1926) 117 Okla. 263, 246 P. 606; Shaw v. Stevenson (1926) 119 Okla. 182, 249 P. 306; Shaffer Oil & Refining Co. v. Thomas (1926) 120 Okla. 253, 252 P. 41; Magnolia Petroleum Co. v. Witcher (1929) 141 Okla. 175, 284 P. 297; Lone Star Gas Co. v. Parsons (1932) 159 Okla. 52, 14 P.2d 369; Ramage Mining Co. v. Thomas, supra; and Phillips Petroleum Co. v. Matthesen (1935) 171 Okla. 541, 44 P.2d 56. Some of these latter cases distinguish City of Shawnee v. Cheek, supra, on the facts, but the fundamental principles applied are the same.

The basic explanation of the doctrine is expressed in an equally exhaustive analysis of the doctrine as applied to the dynamite cap cases, in Lone Star Gas Co. v. Parsons, supra, reaching a result contrary to City of Shawnee v. Cheek, supra. It is there suggested that "the problems involved would be more simple if we would recognize that we were dealing merely with a problem of whether a duty to exercise care should be imposed, or whether, conceding there was some duty, sufficient care was used, and that the doctrine involves an exception to the rule denying protection to trespassers." The true basis of the doctrine may be stated as follows: The doctrine presents a necessity of compromise between the policy of refraining from imposing duties restricting a landowner in the use of his premises, weighed against the harm that urges the imposition. In one of the pans in the balance is the interest of society in the safety

of its children, and in the other is the inherent right of a landowner in the enjoyment of his property in connection with economic progress. It is with reluctance that courts impose duties on landowners. They will not impose a duty to alter the natural condition of premises, nor a duty to exercise care in the safekeeping of instrumentalities that are common and are in everyday use. The doctrine is limited to instrumentalities which are unusual, especially dangerous in their nature, and which are of a character to prompt the curiosity of an infant. But even so, there is also required a reasonable probability of the presence of children near the instrumentality so as to indicate the probability of harm, and that the imposition be reasonably feasible, not unduly burdensome, and can be seen to be fairly justified by a fair evaluation of the factors presented in the particular case. 45 C. J. 761; 20 R. C. L. 79, sec. 70.

With this background we look to the factors to be considered in applying and weighing these principles. For practical purposes, the law turns to classification based upon sets of circumstances most commonly appearing in cases where the doctrine of attractive nuisance is sought to be invoked, and by the classification is prescribed the limitations or requirements by which the application of the doctrine must be tested. The defendant contends that there are seven elements, all of which must be present in order to invoke the doctrine. These elements are taken from the general law. We do not deem it necessary to decide whether the defendant is correct in its insistence on each of these elements as being essential. In City of Shawnee v. Cheek, supra, and Lone Star Gas Co. v. Parsons, supra, this court defined the essential factors. In the former case, they are specified as follows:

"* * * The attractiveness and accessibility of the place or thing involving such danger to and the probability of such trespassers, the gravity of the danger in such condition, the length of time such condition has existed, the smallness of cost and of deprivation of beneficial use involved in eliminating the same, and the reasonableness of the inference that the landowner, as a person of ordinary sensibilities and prudence, knew or should have known of, and under all the facts and circumstances in the case should have eliminated such danger, are proper considerations in determining whether there was such reckless disregard for the safety of such trespassers."

In Lone Star Gas Co. v. Parsons, supra, it is said:

"So in these cases we have the question of how uncommon is the instrumentality; how unusually dangerous it is; how attractive it is; what probability is there of children coming in contact with it; whether the probability is localized so that harm can be avoided, or is there merely a high probability that at some time and in some place children will come in contact with it, with nothing to indicate when and where the contact will come; how feasible is it to avoid danger of harm; how great would be the burden of avoiding or lessening danger of harm, and the effect of imposing such duty. And one outstanding inquiry that is often given scant consideration by the judges is the apparent intelligence of the child, his intelligent consciousness of the circumstances, and that he had reached the age where he would reasonably be expected not to tamper because of his appreciation of danger or appreciation of his want of right to tamper, so that no duty to protect him could reasonably be imposed."

In view of these principles we are impelled to the conclusion that the judgment must be reversed. Under the evidence we do not think it can be said that the defendant could have anticipated the presence of the plaintiff or any child at the pump house or place where the injury occurred. The contrivance which caused the injury was not located near a town or city or near any playground or place where children frequently congregated or played. The evidence does not show that any children had ever played around defendant's machinery prior to the time of the accident. On the contrary, plaintiff's father testified that he had never seen children playing around the pumping equipment before, and that plaintiff had been repeatedly warned not to do so. We think the defendant could reasonably expect the plaintiff's father, who was the pumper in charge of the operations on the lease, to protect his child against injury by the pumping equipment. While the negligence of the parents of the plaintiff cannot be imputed to her (Lone Star Gas Co. v. Parsons, supra), yet the right of the company to reasonably expect them to protect her goes to the question of the company's failure to exercise ordinary care. Pennington v. Little Pirate Oil & Gas Co. (1920, Kan.) 189 P. 137; Magnolia Petroleum Co. v. Porter (1929, Tex. Civ. App.) 22 S. W.2d 695.

Plaintiff relies upon the physical facts to support the inference that the defendant should have anticipated her presence, em-

phasizing the location of the house with respect to the pump house and the absence of intervening fences. The house was located about 225 feet from the pump house on the opposite side of the pump house where the accident occurred and separated by a roadway running to the county section line road. In this connection, the case of City of Grandfield v. Hammonds, supra, is analogous. There the attractive nuisance doctrine was rejected where a child of three years was drowned by falling into a well located about 75 feet from the house where she was visiting with her mother. We are not indicating that it could not be said by a jury that a child could migrate in his playing beyond a certain area, but to impose liability on a landowner it must be said that the migration to a particular place should reasonably have been anticipated. It cannot be said under the facts of the instant case that the probability of trespass at a particular place can be localized so that harm could have been avoided. The evidence is to the effect that machinery on other parts of the lease is equally dangerous, if not more so, and it appears from the record that wells and other places of danger are equally accessible. The most that can be said is that there is a possibility that at some time and in some place on the lease, children will come into contact with the dangerous machinery, but there is nothing to indicate when and where the contact will come. In such case the burden of avoiding or lessening the danger would be very great, and in many cases for all practical purposes impossible. This court, and the court below, can take judicial knowledge of the nature of the operation of oil and gas properties in weighing this factor. As to the elimination of the particular danger causing the injury to plaintiff, a witness for defendant indicated that they could have built a fence for each rod line, and another witness for defendant said, "You could do most anything you might see fit to do as to that matter." The evidence was uncontradicted that the equipment used by defendant was standard equipment and that there was no known safety device applicable to such connections. It was further uncontradicted that it was not customary in the oil and gas business to erect fences around powerhouses or rod lines. The appliances in question are common in the oil industry and are situated on practically every pumping lease throughout the state. There is no evidence tending to show that they were not operated in the ordinary and usual manner. In Turner v. Durant Cotton Oil Co., supra, it is said:

"We believe the rule supported by the great weight of authority and sustained by reason and common sense is: That the owner of premises has the right to place on them such buildings and improvements as is necessary to carry on any legitimate business in which such owner is entitled to engage, and he is under no duty to exercise care to make them safe for the use of others, even children, coming thereon without invitation, authority or allurement."

Plaintiff relies strongly on the case of Shaffer Oil & Refining Co. v. Thomas, supra, where recovery was allowed for injuries received by a boy who saturated himself with gasoline from a stopcock on a drip and attempted to dry himself with a fire. That case is distinguishable for the reason that it appears that the drip was in close proximity to a playground and path frequented by children and that there was at the time a known safety device which could be attached with nominal expense. The other cases relied on by plaintiff are also distinguishable on their facts for similar reasons which we do not deem necessary to enumerate here. Plaintiff, however, urges that these are questions of fact for the jury and refers to Littlejohn v. Midland Valley R. Co., supra. As to the matters which we have referred to, we think there can be no reasonable difference of opinion, and there can be no doubt as to their proper and comparative evaluation. A submission of the case to the jury is an admission that a finding by them either way is not improper, and considering the evidence regarding the factors essential in determining liability, we think it was clearly error to submit the case to the jury. The attractive nuisance doctrine is based upon the law of negligence, and by reason of the foregoing considerations, plaintiff has failed to establish primary negligence. It is unnecessary for us to discuss the other contentions of the defendant.

The judgment is reversed, with directions to enter judgment in favor of defendant.

OSBORN, C. J., BAYLESS, V. C. J., and GIBSON and DAVISON, JJ., concur. RILEY, WELCH, PHELPS, and CORN, JJ., dissent.