STANOLIND OIL & GAS CO. v. JAMISON.

No. 33449. Aug. 1, 1950.
Rehearing Denied Feb. 6, 1951.

*227 P. 2d 404.*

Donald Campbell and T. W. Arrington, Tulsa, Ralph J. May, Oklahoma City, and Fellows & Fellows, Tulsa, for plaintfif in error.

Lillard & Lillard and John M. Lawrence, Oklahoma City, for defendant in error.

LUTTRELL, J. This action was brought by plaintiff Alexander Jamison, special administrator of the estate of Frances Catherine Davis, deceased, against the defendant Stanolind Oil & Gas Company, to recover damages for the wrongful death of deceased. From a verdict and judgment for plaintiff, defendant appeals.

Frances Catherine Davis, the deceased, was a child of the age of eight years at the time of her death, and the action was brought under the attractive nuisance doctrine. There is no dispute as to the essential facts. The deceased child lived with her mother, her ten year old brother and her uncle, her mother's brother, upon a 160-acre tract of land in Logan county, owned by the latter, upon which land the defendant had an oil and gas lease with a producing well. Upon this lease, some 194 feet from the fence surrounding the residence in which deceased and her family resided, defendant had erected a battery of four 500 barrel steel flow tanks, the tanks being 16 feet in height and 22 feet in diameter. Surrounding these tanks was a low earthen barrier or fire wall to prevent the escape of oil upon the adjacent land in the event of fire or other injury to the tanks. Near the top of the tanks was a narrow walkway or cat-walk with a railing around it to prevent persons from falling, which cat-walk was reached by a flight of 21 steps. On top of each tank, located near the cat-walk, was a vent or thief hatch, as it was commonly termed, an opening some 7 1/2 or 8 inches wide by 21 1/2 or 22 inches long, which opened into the tank, and which was used in gauging the amount of oil in the tank. Each thief hatch had a steel lid or top which was not fastened down and was easily raised or lowered, so that when an excessive amount of gas collected in a tank the pressure thereof would automatically raise the lid and permit the escape of the gas.

On the morning of August 12, 1945, at about 8 o'clock in the morning, an employee of defendant found the child Frances Catherine Davis on the cat-walk at the top of the tanks, with her face in the vent or thief hatch of said tank. When he found her she was dead. Apparently she had gone up the steps and along the cat-walk to the tank, and had found the thief hatch lid raised, or had raised it, and while looking down into the tank had been overcome by the gas. A former employee

of defendant, who was employed on the lease at the time the accident occurred, testified that the child and her brother sometimes played in a road on the lease which led past the tanks, and that at one time he had taken them up the stairway and upon the cat-walk, and let them look down into the tank through the thief hatch, and that he had warned them to stay away from the tanks and not attempt to climb up to the cat-walk because of the danger of falling, and also because of the possibility of fire. He further testified that at one time he saw the ten year old brother of deceased upon the cat-walk raising and lowering the lid of a thief hatch, and that he had warned him not to climb up to and upon the cat-walk because of the danger of falling therefrom. The uncle of deceased testified that he saw her playing upon the cat-walk and told her to stay down from there, that she might fall off and get hurt.

From the evidence it appears that neither the children nor their mother nor uncle had ever been warned of the danger of gas accumulating in the tanks, and that they were unfamiliar with such danger. Both the mother and uncle testified that this same employee had taken them to the top of the tanks and permitted them to look down through the thief hatch, and that the oil in the tanks was a very beautiful sight, in that it reflected all the colors of the rainbow. The mother testified that the dead child was of at least average intelligence, and assisted her in performing various chores about the place. The uncle testified that on that particular morning she had gone to the pasture and driven up the cows for him, going into the roadway which led past the tanks through a gate which, while ordinarily closed, was not locked, and that after she brought up the cows he assumed she had gone to the house and had no knowledge of her whereabouts until informed by defendant's employee of her death.

From the evidence produced by defendant it appears that the tanks were usual and ordinary equipment on oil and gas leases in that vicinity, and that ordinarily no precautions were taken to fence the stairway or place a gate thereon in order to prevent persons from climbing to the top of the tanks.

Defendant in seeking reversal of the case first contends that the trial court erred in refusing to grant a mistrial because of prejudicial remarks in the opening statement of counsel for plaintiff. From the record it appears that in the opening statement one of counsel for plaintiff stated that within a week after the death of deceased the defendant erected a fence around the tanks. The trial court, upon objection by defendant's attorneys, admonished the jury not to consider the statement so made, and ordered it stricken, but refused to grant a mistrial. Defendant argues that this was prejudicial error, calling attention to Kaw Boiler Works v. Frymyer, 100 Okla. 81, 227 P. 453; Incorporated Town of Sallisaw v. Wells, 90 Okla. 78, 216 P. 118, and other cases holding that evidence of repairs subsequent to an accident or injury is not admissible for the purpose of establishing negligence.

We think that the prompt action of the trial court in admonishing the jury that the statement should not have been made by counsel, and was not to be considered by them, was sufficient to prevent its consideration by the jury, especially where plaintiff made no attempt to introduce evidence showing that a fence was later constructed around the tanks. Charley v. Norvell, 97 Okla. 114, 221 P. 255; General Pipe & Supply Co. v. Brown, 144 Okla. 236, 291 P. 104.

Defendant next contends that plaintiff had no statutory power or authority to institute this action. In its answer defendant questioned the power and authority of plaintiff to maintain the

action, and early in the trial introduced in evidence a complete record of the appointment of plaintiff as special administrator by the county court of Logan county. The order of appointment did not recite any power to be exercised by the special administrator, and the clerk of the county court certified that there was no minute entry upon the minutes of the county court specifying the powers to be exercised by the special administrator as provided by 58 O. S. 1941 §212. The trial court overruled all of defendant's objections to the further prosecution of the action on the ground of lack of authority in the plaintiff to prosecute the action, and after the verdict and judgment permitted plaintiff to file an amendment to his petition, attaching thereto an order nunc pro tunc made by the county court of Logan county, reciting that by inadvertence the former order had not granted power or authority to plaintiff to bring and maintain the action, and specifically conferring that power upon him.

Defendant moved to strike this amendment, which motion was by the trial court denied, and defendant's motion for new trial and supplemental motion for new trial because of error of the court in allowing the amendment were by the trial court overruled. Defendant contends that the failure to incorporate in the original order appointing plaintiff special administrator any power or authority to bring and maintain this action rendered the appointment fatally defective, and that same could not be corrected by any subsequent order, citing cases from Texas and California in support of this assertion.

We consider it unnecessary to determine whether the first appointment was void, or whether it could be corrected by the subsequent order, for the reason that under our authorities the amendment merely substituted the properly appointed and empowered special administrator for one whose prior appointment was defective. Such

amendment is, we think, provided for by 12 O. S. 1941 §317, which permits the court, before or after judgment, to correct "a mistake in the name of a party or a mistake in any other respect."

In Dierks v. Walsh, 196 Okla. 372, 165 P. 2d 354, the action was brought in the name of a party who had died prior to the commencement of the action, and the trial court, upon that fact being brought to its attention, permitted the substitution of the grantee of said deceased plaintiff. This court upheld the substitution, stating that it was permissible under section 317, supra, where the cause of action remained the same and the defendant was deprived of no defense. Other cases holding that where an action is improperly brought in the name of one party the real party in interest may be substituted by amendment are McIntire v. Torrence, 185 Okla. 19, 90 P. 2d 17; Atlas Assurance Co. of London v. Fairchild, 171 Okla. 609, 43 P. 2d 482; Reeves v. Noble, 88 Okla. 179, 212 P. 995, and Dolezal v. Bostick, 41 Okla. 743, 139 P. 964. In the two last mentioned cases the substitution was made in this court upon appeal, the court considering the pleadings as amended to show that the action was brought in the name of the real party in interest.

In the instant case the mother was the real party in interest, she being the next of kin of the deceased. 12 O. S. 1941 §1053. She could have maintained the action in her own name. 12 O. S. 1941 §1054. Therefore, the requirement pointed out in Dierks v. Walsh, supra, that there must be a person in being who could maintain the action in his or her own name is complied with, and the mother could have been substituted as party plaintiff under the rule announced in that case. Instead of having herself substituted she perfected the appointment of the administrator so that he was then qualified to act as her representative. This was equivalent to the substitution of herself, and

such substitution was permissible under the decisions cited above.

The reason for permitting such substitution after judgment is that since the cause has been tried on its merits, and the losing party has been deprived of no defense or right which he would have had had the proceeding been brought by the proper party, the reversal of the cause and a retrial would only cause unnecessary delay and trouble for the parties.

In the instant case the subsequent order made by the county court of Logan county corrected any defect in the appointment of the special administrator theretofore existing, and made him the legal representative of the real party in interest in this action. The fact that the prior appointment was defective did not work any hardship upon defendant, or deprive it of any defense, but the case was tried in all respects as if plaintiff's appointment had been properly made and was valid. We think the amendment was properly allowed, and that no injury resulted to defendant thereby.

The defendant next contends that the evidence is insufficient to establish negligence on its part under the attractive nuisance doctrine, upon which theory the case was tried and submitted to the jury. Defendant urges that the tanks were common ordinary oil field appliances and in common use, and that as to such appliances the doctrine of attractive nuisance does not apply. It says that the doctrine is limited to instrumentalities which are unusual and with which children do not commonly come into contact, and which are especially dangerous in their nature, and that in addition to all this there must be a probability of harm, citing Lone Star Gas Co. v. Parsons, 159 Okla. 52, 14 P. 2d 369; Sinclair Prairie Oil Co. v. Smith, 186 Okla. 631, 99 P. 2d 903, and Shell Petroleum Corp. v. Beers, 185 Okla. 331, 91 P. 2d 777.

In Lone Star Gas Co. v. Parsons, supra, where a boy was helping his father cultivate a field in which the defendant had a producing gas well, the boy found, and was injured by, some dynamite caps which had been left upon the premises by the drilling contractor. In that case we held that the explosive was a dangerous instrumentality, and that defendant was liable, but reversed the case because of the improper assessment of damages.

In Sinclair Prairie Oil Co. v. Smith, supra, we held that the defendant was not liable for an injury to a small child received while playing upon a swing or sweep used in pumping a well. In that case the child was 19 months old. The swing was a common oil field appliance not ordinarily fenced or guarded in any way, and held no concealed, hidden or latent dangers. We held that in such case, where it was not shown that before the accident children had been seen around, about, or near the swing, or that defendant's attention had previously been called to the probability of children being attracted to the premises, a mere possibility of the presence of children was not sufficient to impose a duty upon the owner, and that defendant was not liable.

In Shell Petroleum Corp. v. Beers, supra, a somewhat similar case, the child's hand was caught in a rod line near a pump house upon the oil company's lease. The uncontradicted evidence was that no children had been previously seen playing at that particular place; that the danger was open and apparent, and that there was no concealed or hidden danger in the appliance. It further appeared that it would be impracticable to fence or guard the rod lines running from defendant's wells. We held that in view of all these circumstances defendant was not liable.

We think the facts in the instant case do not bring it within the rule announced in the two last mentioned cases. In this case the defendant's tank gauger, who was also charged with the duty of switching the oil produced from one tank to another when one

tank became too full, testified that he had seen these two children playing in the road close to the tanks; that he had seen the little boy upon the cat-walk surrounding the tanks, and that he had taken both children upon the cat-walk so that they could look into the thief hatch on the tank and see the oil underneath. It is admitted that the gas coming from the oil in the tanks and collecting at the top of the tanks was dangerous, and this was not communicated to the children nor their mother nor uncle, nor were they at any time warned of such danger.

While it is true that the tank was an ordinary oil field tank and that there were many more in the oil field in which this property was located, it is not shown that there were any others close to the dwelling in which the deceased lived. The fact that the cat-walk and the thief hatches on the tanks were easily accessible by the use of the steps or stairway leading up to the cat-walk; that the oil in the tanks was beautifully colored when observed from the thief hatch, and that the children had been permitted to see this when defendant's gauger took them up on the cat-walk, all tended to make the tanks alluring to an eight year old child unacquainted with the danger, and to cause her to climb up to the cat-walk and look down the thief hatch in order to see the multicolored oil. Thus, in the instant case we have that which was lacking in both Sinclair Prairie Oil Co. v. Smith, supra, and Shell Petroleum Corp. v. Beers, supra, that is, an instrumentality not unattractive, and containing a concealed and inherent danger, near which these children frequently, or at least occasionally, played. In such case we think that questions of fact for a jury were presented.

In Phillips Petroleum Co. v. Matthesen, 171 Okla. 541, 44 P. 2d 56, a five year old child was injured by a heavy eight inch iron pipe, placed in the public street on a slope toward a ditch, rolling upon it. Defendant's workmen had knowledge that children had been playing there during the day. We held that whether the pipe was blocked, or whether it was properly blocked; whether it was attractive to allure children into danger, or whether the situation was such as to suggest to the defendant the probability of accidents, were all questions for the jury. In that case, as in Sinclair Prairie Oil Co. v. Smith and Shell Petroleum Corp. v. Beers, supra, the appliance in itself was not a dangerous instrumentality, just as the tanks in the instant case were not in themselves a dangerous instrumentality. But in the Matthesen case, as in the instant case, there was a concealed and inherent danger to children playing around the pipe, if in fact it was not properly blocked so that it would not roll down the slope when children played upon it.

We are unwilling to hold that the evidence in the instant case, as summarized above, negatived the existence of any duty upon the defendant to anticipate the presence of children near or upon the tanks, and to guard against the danger of injury to them from the gas escaping from the vents on the tanks. We think the trial court properly submitted the issues to the jury, and that the jury's verdict finding the defendant guilty of negligence was sustained by sufficient evidence.

Defendant next complains that the damages awarded by the jury were excessive, and that the court instructed the jury that plaintiff was entitled to recover reasonable and necessary burial and funeral expenses, not to exceed the sum prayed for in the petition. We are unable to agree with this contention.

In Lakeview, Inc., v. Davidson, 166 Okla. 171, 26 P. 2d 760, we held that compensation for the loss of life of a child due to the negligent act of another should be measured by the experience and judgment of the jury, taking into consideration the age, sex, and condition in life of the deceased child, citing numerous cases in sup-

port of that statement. In that case the child was a boy aged five years, and we held that judgment for damages for his death in the sum of $8,000 was not excessive. We do not consider the judgment for $10,000 in the instant case excessive.

As to the instructions given by the trial court on this phase of the case, examination discloses that the jury were instructed to consider the value of the earnings or services which the mother could reasonably expect from the child, considering the child's station in life, health, intelligence, and probable future earning capacity, and what amount she might reasonably be presumed to have contributed to her mother until she became of age, less the reasonable charges for upkeep such as food, clothing, medical expenses and schooling, and therefrom determine the actual pecuniary loss sustained by the mother by reason of the death of her daughter, but not to exceed the amount sued for. In the same instruction the jury were told that if they found for the plaintiff, plaintiff was also entitled to recover the reasonable and necessary burial and funeral expenses of the deceased, not to exceed the sum of $450. We find no error in the instruction so given.

Affirmed.

ARNOLD, V.C.J., and CORN, LUTTRELL, HALLEY, JOHNSON, and O'-NEAL, JJ., concur. WELCH and GIBSON, JJ., dissent.

GIBSON, J. (dissenting). I am of the opinion that the statement of the law in the first paragraph of the syllabus is unsound and that if permitted to stand it will encourage a practice which the policy of the law seeks to prevent.

The substance of the holding is that the error is cured by the instruction of the court to the jury to not consider the improper statement where "the record does not disclose that any prejudice resulted to the losing party thereby."

The making of the improper statement constitutes reversible error unless the defendant was not prejudiced thereby. Hence, logically, the error arising from the statement remains until it can be said that prejudice did not result. It cannot be said as a matter of law that the instruction of the court was sufficient to and did remove the prejudice. Therefore, the absence of prejudice must appear as a matter of fact. These conclusions are sustained by the holding in Charley v. Norvell et al., 97 Okla. 114, 221 P. 255, which is relied on as authority for the holding of the majority opinion. It is true that the fifth paragraph of the syllabus of that case standing alone lends support to the holding of the majority. It reads:

"Record examined, and held, that no misconduct on the part of defendants or abuse of discretion on the part of the trial court sufficient to justify a reversal is shown."

This language indicates that the fact of prejudice must appear from the record as held in the first syllabus herein. In my opinion, however, the quoted paragraph does not correctly reflect the holding of the Charley case which is to the effect that in order to cure the error *it must appear from the record that no prejudice obtained.* In the cited opinion, after reciting the pertinent matters of record, it is said:

" . . . Whatever may be said with reference to the prejudicial nature of counsel's remarks, in view of the statement of the court to the jury and in keeping with this statement, its action in refusing to permit any testimony on that matter to be introduced, we think any prejudicial inferences arising from such remarks were cured and cannot properly be urged as ground for reversal.

"In no case that we have been able to find has a reversal ever resulted where it is possible to determine from the whole record that the jury could not have been prejudicially influenced."

It is manifest from this language that the conclusion is predicated upon the

fact that it affirmatively appeared that no prejudice resulted. The difference between the pronouncement in the syllabus and the import of the actual holding in the case was recognized by the editorial staff of the Pacific Reporter which added a sixth paragraph of the syllabus as follows:

"Where it is possible to determine from the whole record that the jury could not have been prejudicially influenced by misconduct of counsel, the cause will not be reversed."

As I view it the import of the decision is correctly reflected in the editorial syllabus.

I am of the opinion that the law announced in the first syllabus is wrong because not supported by sound reasoning or authority. And I also think that adherence thereto will be fruitful of miscarriage of justice. As said by the Supreme Court of Texas, in G. C. & Santa Fe Railway Co. v. Levy, 59 Tex. 542, 46 Am. Rep. 269, 278:

"The practice of admitting improper evidence, with the promise or expectation of subsequently directing the jury not to consider it, or of controlling it by the charge, is not to be encouraged; for upon minds misdirected in legal investigations, and excited by sympathy aroused by recitals of apparent hardship, such directions or instructions will usually be found impotent to efface impressions once made."

The opportunity for injecting improper evidence into a cause is best afforded through the opening statement of counsel and the danger of the jury receiving indelible impressions is most imminent at that time when the mind of the jury is entirely open and eager to gather the truth of the matter they are to weigh. To say that in such situation the injection of improper evidence is not reversible error unless the fact of prejudice thereby is demonstrated by the record is practically to place a premium on improper conduct of counsel because he can enjoy the assurance the prejudicial impression may exist and operate without tangible evidence of that destructive fact.

Also, I cannot concur in the holding that the amendment of the petition by leave of court was effective to cure the defect of party plaintiff.

The basis of the conclusion is that even though the plaintiff was without authority to institute the action he became clothed with such authority upon entry of the nunc pro tunc order, which occurred several weeks after the trial was had, and, being capacitated at the time of the amendment, the trial court was authorized to substitute him as party plaintiff on authority of 12 O. S. 1941 §317, as construed in Dierks v. Walsh, 196 Okla. 372, 165 P. 2d 354. Therein, after holding that a judgment is a nullity where there is in being no one with a legal or beneficial interest in the cause of action, it is said:

"But where there is a person in being who has a legal or beneficial interest in the cause of action and is capable of bringing the action in his own name, and brings it in the name of another person, whether such person be living or dead, an amendment substituting the real party in interest as plaintiff is permissible where the cause of action remains the same and defendant is deprived of no defense. Lewis v. Austin, supra; Denton v. Stephens et al., 32 Miss. 194; Justices of Camden County v. Sawyer, 9 N. C. 61."

In the instant case the mother of deceased was the real party in interest. And, on authority of the Dierks case, the trial court could have permitted an amendment substituting her as plaintiff. As reflected in the opinion therein, the propriety of such substitution is predicated upon the idea that the real party in interest may be considered as having appeared through the titular plaintiff and the error thus going to form rather than to substance is not vital and stands corrected where the real party in interest becomes the plaintiff of record.

There is nothing in the Dierks case that can be construed as giving countenance to the conclusion that anyone other than the mother of the deceased

could be substitued as the party plaintiff. The restrictive basis of the right to substitute negatives the idea that one other than the mother of the deceased could be substituted as plaintiff.

Unless the nunc pro tunc order can be construed as reflecting the existence of authority in the administrator to institute the action at the time of the institution thereof, there is no escape from the conclusion that the trial court was without jurisdiction to proceed with the trial and to render judgment.

The method prescribed for the appointment of special administrators and for clothing them with the powers to be exercised is prescribed in 58 O. S. 1941 §212, as follows:

"The appointment may be made without notice, and must be made by entry upon the minutes of the court specifying the powers to be exercised by the administrator. Upon such order being entered, and after the person appointed has given bond, the judge must issue letters of administration to such person, in conformity with the order in the minutes."

In making the appointment of the special administrator there was no specification upon the minutes, or elsewhere, of his powers as such. Since by the terms of the statute the specification of the powers to be exercised is made mandatory and thus a condition precedent to the grant of letters carrying such powers, the plaintiff herein did not become clothed with authority to institute the action. In view of the clear import of the statute, that the definition of the powers must precede the grant of letters, the county court is necessarily without jurisdiction to later supply such power through retroactive order or thereby render authoritative acts theretofore done by the administrator without authority by reason of the absence of power. An authority clearly in point and holding in accord with these views is P. J. Willis & Bro. v. Pinkard (Tex. Civ. App.) 52 S. W. 626.

I am of the opinion there was an entire absence of capacity in the plaintiff to maintain the action. That the absence of such capacity is ground for abatement of the action is clear. Harrington v. Central States Fire Ins. Co., etc., 169 Okla. 255, 36 P. 2d 738, 96 A. L. R. 859; William G. Krutz v. Paola Town Co., 20 Kan. 397, 402. If my conclusions are sound the court committed reversible error in not abating the action because of the absence of a party plaintiff.

Also, I cannot concur in the holding of the majority opinion that there was sufficient evidence of actionable negligence to warrant submission of the issue to the jury. And, being of the opinion that the effect of the holding is not only to justify the trial court in submitting to the jury vital issues of fact upon which there is not sufficient competent evidence to support a finding thereon but also, in effect, to expand the application of the doctrine of attractive nuisance beyond the confines to which it has been expressly limited by prior decisions of this court, I feel impelled to state the reasons for my dissent from such holding.

It is elementary that there can be no actionable negligence in absence of some duty which has been neglected or violated and of injury to another as a consequence thereof.

The duty involved herein is that which the courts impose upon owners of premises to avoid injury to children considered as technical trespassers. Declaratory of the situations which give rise to the duty there is said in Lone Star Gas Co. v. Parsons, 159 Okla. 52, 14 P. 2d 369:

" . . . They will not impose a duty to alter the natural condition of premises, nor a duty to exercise care in the safe-keeping of instrumentalities that are common and are in common everyday use. The doctrine is limited to instrumentalities that are unusual and with which children do not commonly come into contact, which are

especially dangerous in their nature, and which are of a character to prompt the curiosity and interest of an infant and thereby lead to his tampering with them. Nor will the doctrine be applied to protect an infant who is of sufficient age and experience to be conscious of an appreciable element of danger inhering in the tampering with the instrumentality to an extent that it would be expected that he would not jeopardize his safety by tampering, or where he has reached the age of such responsibility that he should be intelligently conscious of the want of right to tamper with an instrumentality belonging to another and not apparently abandoned or valueless, or where the child meddles with the instrumentality in a spirit of bravado. But even if such a condition does not exist and the infant is at the age that is described as 'of tender years,' is ignorant of the danger, lacking in intelligent consciousness of lack of right to trespass, the instrumentality is uncommon, unusually dangerous, and attractive, there is also required a probability of harm, so that the duty will not be imposed unless there is such reasonable probability of the presence of children near the instrumentality as to indicate the probability of harm. . . .

"So, in these cases we have the question of how uncommon is the instrumentality; how unusually dangerous it is; how attractive is it; what probability is there of children coming in contact with it; whether the probability is localized so that harm can be avoided, or is there merely a high probability that at some time and in some place, children will come in contact with it, with nothing to indicate when and where the contact will come; how feasible is it to avoid danger of harm; how great would be the burden of avoiding or lessening danger of harm, and the effect of imposing such duty. And one outstanding inquiry that is often given scant consideration by the judges is the apparent intelligence of the child, his intelligent consciousness of the circumstances, and that he had reached the age where he would reasonably be expected not to tamper because of his appreciation of danger or appreciation of his want of right to tamper, so that no duty to protect him could reasonably be imposed."

Indicative of the imperative need that the trial court evaluate the facts where such determination is properly a matter of law instead of relegating same to the jury, there is said:

"The lack of resolution, ill-considered sentimentality, and sloth and laziness, unfortunately too often displayed even by judges, resulting in abdicating their functions to juries has been vigorously urged by many in repudiation of the doctrine. The argument is potent as a warning but does not justify a repudiation of the doctrine. It must be conceded that sometimes there is difficulty in weighing and evaluating the factors presented in the cases, but if this duty is not avoided by concealing its necessity by the fiction of an invitation, this difficulty appears much less objectionable than the danger urged, that many judges do not withhold from the jury the power of decision as to what are the facts when there can be no reasonable difference of opinion as to what they are or the evaluation of the factors when there can be no reasonable doubt as to their proper and comparative evaluation, with the consequent result that unjust verdicts are rendered by juries who are not subject to criticism, because they have not violated the instructions of the judge, for the very submission of a case to them is an admission that a finding by them either way is not improper. It can with reason be hoped that the great progress made in recent years in legal thought, training, and education will tend greatly to the correction of this still common evil."

The authority of the trial court to do so was invoked in this case. The court held the evidence sufficient to go to the jury and the opinion sustains the holding.

I take it that, in order to justify the action of the trial court in light of the rule declared in the Lone Star case, it is incumbent upon this court to indicate the existence of an issue of fact on each of the necessary elements involved and to state with particularity the evidence which is deemed sufficient to warrant the submission

thereof. That such was attempted is not indicated in the opinion or in the syllabus. Plaintiff in error challenges the action of the court as being at variance with the principles stated in the Lone Star case and reiterated in Sinclair Prairie Oil Co. v. Smith, 186 Okla. 631, 99 P. 2d 903, and Shell Petroleum Corp. v. Beers, 185 Okla. 331, 91 P. 2d 777. The majority opinion disposes of the contention by mentioning the diversity of the facts. Such disposition without more is not sufficient to answer argument properly based upon the principles of those cases which have equal application herein. The facts stated in the syllabus (point 3), if true, are insufficient to reflect that each and all of the issues were properly matters for the jury. I am of the opinion the syllabus is misleading as to the facts as well as deficient. My reasons for this statement will appear in the course of the further discussion.

There are two prime questions. One, was there a duty imposed, and, two, was the injury a proximate result of a failure to perform the duty? The facts pertinent to the determination of both questions are not in dispute and, in my opinion, there is no reason why reasonable persons should differ as to the inferences or conclusions to be drawn therefrom. If I am correct in this, the duty of determining the issue devolved upon the court.

I gather from the quoted doctrine that, in order to establish the fact of such duty, it is necessary that there be proof of each of the elements there mentioned as a prerequisite. I stress the following: (1) The instrumentality must be uncommon and the dangerous character thereof unusual; (2) the instrumentality must also be attractive to children; (3) that probable contact by children therewith should reasonably be anticipated, and (4) there must appear such probability of injury to result from such contact that the owner, as one of ordinary sensibility and prudence, would exercise care to avert such contact. If proof of each be necessary it follows that the absence of proof of any will preclude the existence of the duty. I shall consider them in the sequence stated.

Since the hatch and its functioning is an essential part of the tank, its dangerous character can be no more unusual than the tank is uncommon. The evidence reflects that the use of such tanks was prevalent throughout the oil field of which the premises herein were a part. The opinion recognizes that the tank battery here involved was of common use but appears to conclude that the same may be treated as uncommon by reason of its location. The matter is so considered and disposed of in the following language:

"While it is true that the tank was an ordinary oil field tank and that there were many more in the oil field in which this property was located, it is not shown that there were any others close to the dwelling in which the deceased lived."

However pertinent such proximity may be to the consideration of other questions involved, it cannot suffice to make the instrumentality uncommon where such is not the fact.

As evidence reasonably tending to prove that the instrumentality was attractive to children the opinion recites the existence of the catwalk, its accessibility by means of the stairway, the fact that the oil was beautifully colored when viewed from the thief hatch, and the fact that the defendant's gauger had previously taken the deceased and her brother up on the catwalk to see the oil coming into the tank. The fact that the law contemplates that the attractiveness must be in addition to and appertain to an instrumentality that is not common precludes the idea that the ordinary features of an ordinary instrumentality afford evidence thereof. Hence, the only fact cited in the opinion which could afford evidence thereof is that of the engaging beauty of the oil. There is no competent evidence that such attractive quality ever attracted the attention of the deceased or other chil-

104

dren. The evidence reflects that, a few days after the first well came in, Roy Rogers, the pumper in charge, took Mrs. Davis, mother of deceased, and Mr. Christner, her brother, onto the tanks and showed them the oil coming in. Mrs. Davis testified that it was a pretty color to look at, being a "kind of bluish gold." Mr. Christner testified that the oil had a "kind of rainbow color." Neither of the children was with them on the occasion. On another occasion Rogers took the two children onto the tank to see the oil coming in. There is no testimony as to the appearance of the oil on that occasion nor that the children or either of them noted any color effect. It necessarily follows that the statement in the opinion that the deceased was lured thereby is mere conjecture because the evidence thereof is based on inference upon inference. Shell Oil Co., Inc., et al. v. Haunchild, 203 Okla. 456, 223 P. 2d 333; Shell Oil Co. v. Blubaugh, 199 Okla. 353, 185 P. 2d 959.

As indicative of probable contact, the opinion places emphasis upon the fact that Rogers had seen the children playing in the road close to the tanks and had seen the boy on the tank. Any inference that the playing in the road was by reason of the nearness of the tanks is completely negatived by the testimony of Mrs. Davis. She testified that the two children and their visitors would play in the front yard, the back yard and sometimes would go into the pasture to play. She said they also played in the roadway which led to the tanks "because there is a wide space on each side there." There is no evidence that the two children together or either with any of the visiting children were ever seen on or about the tanks. During the six months period between the first use of the tanks and the death, each of the children was seen once thereon. The boy was seen by Rogers, as stated in the opinion. On that occasion, which was more than four months prior to the death, he was slamming the thief hatch up and down. He was made to leave. Then, as pre-

viously, when he took the boy and girl up there, he warned him, and them, to stay away and told them it was dangerous to play there. The girl was once seen playing on the catwalk by her uncle, who made her leave and cautioned her not to play thereon. The children had been previously warned by the mother and the uncle to not go upon the tanks. There is no evidence that Rogers knew of the girl being on the tank when seen there by the uncle. From the viewpoint of defendant there is no evidence of disobedience to the parental and company injunctions to stay away from the tanks other than that of the boy and no violation by him thereafter. The duty to anticipate the presence must be predicated upon a probability thereof that is reflected by the evidence. Therefore, in order to charge the defendant with knowledge of the probability the evidence should reflect that same obtained notwithstanding the injunctions and the conformance thereto as indicated. I submit there is no such evidence.

Touching the fourth element, that of the probability of injury in event of contact with the gas, the opinion appears to predicate the probabliity of injury solely upon the fact that the defendant admits that the gas is dangerous. The conclusion is predicated upon the reply of Rogers to a question asked on cross-examination. The question and answer follow:

"Q. But you knew from your experience that the fumes and odors eminating from those thief hatches would cause asphyxiation if a child breathed them? A. I would say if they breathed enough of them."

This should read in connection with the following questions and answers of the witness on re-direct examination:

"Q. Did you ever, in your years of experience, know of any child or adult climbing up on top of a battery of tanks, opening the thief hatch lid and putting their head down in there to smell the odor of gas or oil? A. Not for the purpose of just smelling it becaused they liked it.

"Q. What would their purpose be? A. Well, the purpose would be to find out how strong the gas odors might be.

"Q. That is, in connection with your work in switching the flow of oil in the tanks? A. Not necessarily. When the tanks are to be cleaned, the men inspect the tanks to find out whether there is danger, any danger of working right there around them.

"Q. That is, in connection with their work, is it not? A. Yes, sir.

" . . .

"Q. Did you ever know of anybody before August 12 ever being asphyxiated by sticking their face in the lid of one of these thief hatches? A. I never did."

There is in the record no evidence to the effect that one voluntarily taking a breath of the gas at the hatch would be injured thereby or thereby induced to take further breaths or be prevented from turning away from the gas so as to avoid breathing more of it. So far as the evidence is concerned the death is unexplained and, at the least, extraordinary and, therefore, within the realm of improbability rather than probability. There is no evidence to the effect that one smelling the gas at the hatch in a manner to be anticipated would likely receive injury therefrom.

What I have said concerning the improbability of injury through such contact with the gas is equally applicable to the other essential to liability—that and injury suffered was the proximate result of the violation of the duty imposed. Since it cannot be reasonably said that the death could be the natural or ordinary consequence of the neglect of duty to safeguard the premises if such duty had obtained, it cannot be said that the violation of such duty was the proximate cause of the death.

I am of the opinion that the issues presented herein are issues of law addressed solely to the court and that the court erred in not sustaining the motion for a directed verdict.